## APPEAL OF CALIFORNIA BREWING ASSOCIATION.

Docket No. 3903.   Decided October 30, 1926.

Upon the evidence, *held*, that petitioner, an unincorporated association, was affiliated with several other corporations during 1918 and 1919.

*W. W. Spalding, Esq.*, and *M. Cerf, C. P. A.*, for the petitioner.
*Percy S. Crewe, Esq.*, for the Commissioner.

In this appeal the petitioner contests the correctness of the Commissioner's determinations of deficiencies in income and profits taxes for the calendar years 1918 and 1919 in the amounts of $57,890.23 and $23,624.99, respectively. The issues involved are:

(1) Was the petitioner affiliated with seven other corporations, within the meaning of section 240 of the Revenue Act of 1918?

(2) Should the value of certain plant assets alleged to have been paid in by the five other corporations be included in the petitioner's invested capital?

(3) Is the petitioner entitled to deductions for wear and tear and obsolescence of such assets?

(4) Should the petitioner be allowed to deduct as an ordinary and necessary expense an amount contributed to the State Brewing Association?

### FINDINGS OF FACT.

The petitioner was organized on January 30, 1917, by the following corporations:

> National Brewing Co.
> Acme Brewing Co.
> Union Brewing & Malting Co.
> Claus Wreden Brewing Co.
> Broadway Brewing Co.
> San Francisco Branch of Henry Winehart Brewing Co.

These corporations are hereinafter referred to as "units" or "members" of the Association.

Prior to January 30, 1917, each of the units was an independent corporation not associated with any of the other units, and was engaged in the manufacture and sale of beer on its own account. Shortly before the date above mentioned, it was decided by the officers of each of the units that, owing to the curtailment of sales by prohibition, it would be the part of wisdom for the units to combine their businesses into one central organization, in which each would have an interest based on its sales of beer for the preceding year. This decision resulted in the organization of the California Brewing Association. The law of California permits the organization of an association solely of corporate units and the petitioner is such an organization. The corporate units themselves are its members. They also compose it. It was no part of the plan of organization that any individual or partnership should be included in the organization.

No articles of association or by-laws were adopted by or for the Association. Instead, the structure of the Association and its management, as well as the rights, duties, obligations and interests of the Association and its members *inter sese*, were defined by the contract to which the Association and the units and their stockholders were signatory parties. No shares of stock or certificates of beneficial interest were issued by the Association. Rather was it a part of the plan of organization that the rights and obligations of the owners of the Association should be evidenced by the several contracts hereinafter mentioned.

The Association functioned much the same as a corporation. There was a board of directors which selected the active officers and fixed their compensation. The directors were in control of the business and the affairs of the Association and determined its policies. They had supervision of all of the assets and determined when distributions of earnings should be made. In fact they had all of the powers of boards of directors of corporations of similar size. Each

of the smaller units selected one member of the board of directors of the Association, while the larger units were permitted to select two members.

The first contract of January 30, 1917, between the several units and the Association, provided for the purchase by the Association from the units of their businesses, good will, trade-marks, trade names, raw materials, goods in process, finished product, supplies, machinery and equipment, movables and immovables, for which the Association issued to the units certain class A, B, and C obligations, the amounts of which are not material here. By this contract the units also granted to the Association a leasehold estate in the land and buildings formerly used in the manufacture of beer. Each of the units agreed that it would not at any time engage in the brewing business in the City or County of San Francisco. Paragraph XII provided that, after the satisfaction of its obligations, the Association should pay monthly to each unit a pro rata portion of its surplus earnings, these distributions to be on the barrelage basis, i. e., that each unit should receive such proportionate part of the surplus earnings as its sales of beer, in terms of barrels for the period from December 1, 1915, to November 30, 1916, was of the total number of barrels sold by all members of the Association for that period. The purpose of this provision was to define the proportionate interest of each member in the profits of the Association. Further reference to distributions on the barrelage basis are contained in paragraphs XVIII and XIX of the contract, which provide:

As further consideration to the first party it is agreed in the event the business shall cease to continue, or the Association shall be dissolved, either voluntarily or otherwise, or the Association shall decide to distribute any funds or property owned by it, the first party shall receive such *pro rata* portion of all moneys of the Association on hand, and such *pro rata* portion of the proceeds of all funds derived by the Association from the sales of all property, after paying all the outstanding indebtedness of the Association, as is provided in paragraph XII hereof.

And as further consideration to the first party it is agreed that during the existence of the Association the first party shall be paid by the Association from time to time, in addition to all the foregoing considerations, the same *pro rata* portion of all the net earnings, dividends and profits of the Association as may accrue from time to time, as is fixed by paragraph XII hereof to be paid to the first party. The Association shall require its directors to make such *pro rata* payments to the first party, promptly from time to time as the business of the Association shall justify.

The grant to the Association of the leasehold in the real estate of the units is contained in paragraph V of this first contract of January 30, 1917, which reads:

And the first party does give and grant to the Association the exclusive right and privilege of using all buildings and lands now used as a plant by the

first party, so long as the same may be desired by the Association, not exceeding forty-nine (49) years.

The consideration for the grant of a leasehold in the several plants was the interest of the general grantors, the units, in the Association.

On the same day, January 30, 1917, the second contract—or option agreement, as it is termed in the record—was made between the units and the Association, and provided in part as follows:

That for value received, the first party does hereby give and grant unto the Association, the exclusive right and privilege of using for purposes of the Association, as long as the Association may require the same, not exceeding forty-nine (49) years, those certain buildings and lands now used as a plant by the first party, in the City and County of San Francisco, State of California, and particularly described in Exhibit "A" hereto attached expressly referred to and made a part hereof. And the Association shall have the right and privilege, during the term hereof, of operating the same as a plant, dismantling, closing down, or leasing the same. The rental derived from which in the event of such leasing shall be paid into the Building and Real Estate fund hereinafter created and disposed of as herein provided.

This contract further gave the Association the option and right to purchase at any time within 49 years the plant assets at a price to be fixed by an appraisal to be made within 30 days thereafter by a reputable appraisal company to be selected by the Association. The sole office of the appraisal, stated by the parties in the contract, was the determination of the purchase price to be paid for the plants by the Association upon the exercise of the option. This option agreement further provided for the creation of a building and real estate fund in which certain funds were to be deposited, out of which payments were to be made to the units of the purchase prices of the several plants. The legal or record title was retained by the units.

The third and final contract between the Association and the various units was dated March 21, 1918, and after reciting the steps theretofore taken, viz, the grant of the leaseholds and the giving of the options to purchase, stated that the appraisal of the plants had been made in accordance with the option agreement of January 30, 1917, as follows:

And, WHEREAS, such appraisal has been made of all said buildings and lands of each of the parties of the second part, by the American Appraisal Company, a true and correct copy of which said appraisal of such buildings and lands of each of the parties of the second part, is as follows:

Those of the UNION BREWING & MALTING Co., appraised as follows:

| | |
|---|---:|
| Land | $30,000.00 |
| Wells | 726.90 |
| Buildings | 95,837.91 |
| Total | 126,564.81 |

Those of the CLAUS WREDEN BREWING COMPANY, WASHINGTON BREWERY, appraised as follows:

| | |
|---|---|
| Land | $32,500.00 |
| Wells | |
| Buildings | 45,346.89 |
| Total | 77,846.89 |

Those of the NATIONAL BREWING COMPANY, appraised as follows:

| | |
|---|---|
| Land | $51,000.00 |
| Wells | 1,070.00 |
| Buildings | 166,305.43 |
| Total | 218,375.43 |

Those of the BROADWAY BREWING COMPANY, appraised as follows:

| | |
|---|---|
| Land | $15,000.00 |
| Wells | 1,190.00 |
| Buildings | 22,380.53 |
| Total | 38,570.53 |

Two of the unit corporations held their plant properties under leases which are not involved in this proceeding. After the above-quoted references to the appraisal, the contract provided:

WHEREAS, it is desired by all the parties hereto, that said option agreement be converted into an agreement of purchase and sale, and that in lieu of said option agreement, this agreement shall be substituted and supersede said option agreement.

The contract then provided for the creation of a building and real estate fund in which there should be deposited (a) proceeds of sales of any of the plant assets, (b) rentals received by the Association from the leasing of any of the plants, (c) interest accumulated on loans of any part of the monies of the building and real estate fund, and (d) monthly contributions to the fund by the Association of 2½ per cent to 5 per cent, as the directors may decide, of the total collections of the Association—after which appears the following provision upon which the Commissioner predicated his holding that the plant assets were the property of the units during the taxable years here involved:

As soon as said Building and Real Estate Fund shall amount to the sum of $461,357.66, derived from such sources, then the Association shall purchase, and pay from said fund, for all the buildings and real estate of each of the parties of the second part, described herein, the respective sums, at which the property of each of said parties has been appraised, as herein set forth; said sums to be paid to each of said parties of the second part, at such time, contemporaneously, regardless of the fact that any of said buildings or other portions of said property have been destroyed or damaged from any cause whatsoever.

The intention of the parties to the contract was that the words "shall purchase" should be equivalent to the words "shall acquire

the record title." The contemporaneous construction of the contract by the parties was that the ownership of the plant assets passed to the Association not later than March, 1918, and that the Association could do as it might desire with those assets without the consent of the former owners. The brewing of beer at several of the plants was discontinued by the Association and the equipment permitted to deteriorate. When additional equipment and machinery was needed at the National Brewery plant, where the brewing of beer was continued by the Association, the employees of the Association moved the equipment and machinery needed from other breweries to the National plant. In effecting such removal considerable damage was done to the plants from which the equipment and machinery were taken. Several of the plants were leased by the Association and the rentals were collected and retained by it. No charge was made on the books against the Association or any of the units, no credit was given to any of the units, and no adjustment was made on account of any of these transactions. Two of the plants were sold by the Association and the purchase price in each case was paid to and retained by the Association. In completing these sales, the units were used merely for the purpose of transferring the record title.

It was stipulated by the parties that the actual cash value of the plant assets at January 30, 1917, was $461,357.66, and that the net value of these assets after deducting mortgages was $337,930.62. Subject to depreciation suffered during the intervening period, this value was maintained down to 1918. The stipulation further provides:

It is further stipulated that the amount of obsolescence sustained on said plants, during 1918, was $106,638.27. By this stipulation, the Commissioner does not concede that the ownership of said plants, or any of them. was at any time, in the California Brewing Association.

Prior to making the contracts hereinbefore mentioned, each of the units was in control of its own properties and its own business affairs. By the contracts, however, the units divested themselves of any control whatsoever over the properties and businesses formerly owned and conducted by them. They were left without property or business, and thus became inactive except to receive and disburse their proportionate shares of the profits of the Association. Contracts in each instance were signed by all of the stockholders of each unit. Thereafter the Association became the original source of all earnings and profits and of all distributions to stockholders. There was a complete merger of the business activities of the units into the Association. No other interest was identified with it.

The smaller units selected one and the larger units two members as directors of the Association. The individuals so selected became

the nominees of the Association and the stockholders. To enable them to act as such nominees the representatives were given control of the stock of the units during the taxable years here involved.

The Remar Company, a corporation, was organized in 1918 to manufacture yeast and other materials used by bakeries. Its principal place of business was in Oakland, Calif. It became active in the summer of 1918. Its stock was divided into two classes, pre-ferred and common, both of which had voting rights, and the petitioner and its unit corporations owned 68.651 per cent of preferred stock and 36.11 per cent of common stock. Of the remainder, 26.828 per cent of the preferred and 61.545 per cent of the common was owned by officers of the petitioner or the units and members of their families, interests that were closely affiliated with the petitioner. The latter stockholders acquired their stock with the understanding that the Remar Company was to be one of the group of corporations to be controlled by the Association, and this understanding was observed at all times. In point of fact, the Remar Company was always regarded as a branch of the Association and operated as the interest of the Association required.

In 1918, the Association contributed $6,002.10 to the State Brewers Association and deducted that amount from gross income in its return as an ordinary and necessary expense. This deduction was disallowed by the Commissioner. The State Brewers Association was organized in 1918 for the purpose of bringing the brewers of the State together periodically in conventions for the discussion of their business problems, " to establish trade practices favorable to the industry, to deal with labor collectively and to deal with labor matters specifically such as handling cases of arbitration, disputes between members of the Association and the unions, and to use its influence, collectively, for the elimination of the objectionable features that attached themselves to the brewing business." None of the activities of the petitioner during the taxable years had to do with lobbying or other efforts relating to legislation.

OPINION.

LITTLETON: The first question relates to the disallowance of the deduction of $6,002.10 for 1918 representing a contribution by petitioner to the State Brewers Association. From the evidence submitted, we are of the opinion that this was a proper business expense and should be allowed as a deduction from gross income.

The second issue is whether the petitioner, an unincorporated association, was, during the years 1918 and 1919, affiliated with the seven corporations mentioned in the findings of fact. The six brew-

ing companies together composed the California Brewing Association, which they organized under the laws of California and to which they transferred their entire businesses and assets. The Remar Company was organized in 1918 by the group. The petitioner, a voluntary association of corporations, was taxable as a corporation under the provisions of the Revenue Act of 1918. These powers, duties, rights and liabilities were defined by the contracts hereinbefore referred to. The petitioner had no capital stock. The Commissioner held that it did not control the stock of the units which composed it, and that the stock of the other corporations was not controlled by the same or closely affiliated interests.

Section 240 of the Revenue Act of 1918 contemplates that corporations and associations may be affiliated and speaks of the control of stock, which is evidence of the proprietary interest in a corporation or an association entitling the holder to vote at stockholders' meetings, to receive profits by way of dividends and the assets upon liquidation. When we look for the equivalent of stock in this case, we are immediately confronted with the fact that the six brewing companies composed the Association and, apart from them collectively, it had no existence. Therefore, it seems to us that we have at the threshold of the consideration of the question the patent fact that the question in reality is whether the Association shall be regarded as having been affiliated with itself, for the units were the Association, and we should hesitate before saying that the component parts of an organization must, for tax purposes, be separated from itself. The petitioner and the units which composed it constituted a single business enterprise or unit. Each of the units sold and conveyed to the Association its business and transferred all stock on hand, raw materials, goods in process, finished product and all equipment, together with the management and control of the entire plants and assets of every character and discontinued operations. Thereafter the Association determined which plant or plants should be operated, with the result that three plants were closed and later sold and the proceeds became the property of the Association. Upon the formation of the Association no profits thereafter accrued to the units or to the stockholders of the units, except through the Association. Instead of sharing in the profits through the ownership of stock in the Association, the units and their stockholders received distributions from the profits of the Association under the provisions of the contracts hereinbefore mentioned.

The important point in this proceeding is the manner in which one corporation or association may control the stock of another, so as to be affiliated within the meaning of the statute. A corporation can

function only through agents, and control by these agents is its control. The statute states "where one corporation controls the stock of another," but a corporation can not function and can not control the stock of another except through its agents. No other means of control is possible.

It was provided in the contracts between the various units and the petitioner that the units should have the right to select, in some instances, one, and in others, two members of the board of directors of the Association. When so selected they were the representatives of not only the units but also of the stockholders of the units who were parties to the contracts. They were selected as the representatives of the stockholders and there was no provision for their removal by anyone during their terms of office. The board of directors of the Association controlled the stock that it represented, the selection of the directors being for that purpose. The purpose of the membership representation on the board of directors of the Association was to place the control of the units and the stock, so far as the Association was concerned, with the members who were elected to the board of directors. The directors were first the agents of the Association having the management and control of its affairs—their allegiance was to it, whatever act it performed was through them. When they controlled, being the agents of the Association, the Association controlled. The control here was through interests closely affiliated with the Association.

Under the evidence presented, we are of the opinion that the stock of the Remar Company was owned or controlled by the same or closely affiliated interests. The net income and invested capital of the six brewing companies, the Remar Company and the petitioner for the years 1918 and 1919 should therefore be computed upon the basis of consolidated returns. The amount of obsolescence sustained on the plants for 1918 has been stipulated and the fact of exhaustion, wear and tear is not in question.            ·

In view of our decision upon the question of affiliation, it is not necessary to decide whether real estate of the value of $461,000 should be included in the invested capital of the Association or the units.

*Judgment will be entered on 15 days' notice, under Rule 50.*

GREEN and MORRIS dissent.
PHILLIPS concurs in the result only.
MILLIKEN did not participate.