PIERCE OIL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PIERCE NAVIGATION COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PIERCE PIPE LINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49702–49704. Promulgated April 17, 1935.

*Eugene Untermyer, Esq., Adrian C. Humphreys, Esq., Samuel Untermyer, Esq., Alvin Untermyer, Esq.,* and *Nelson T. Hartson, Esq.,* for the petitioners; and *S. Milton Simpson, Esq.,* and *George E. Cleary, Esq.,* for the petitioner, Pierce Pipe Line Co.

*Henry A. Cox, Esq., Bernard D. Hathcock, Esq.,* and *Tunis A. Dils, Esq.,* for the respondent.

412

OPINION.—For 1918 and 1919 the petitioner claims special assessment under sections 327 and 328, Revenue Act of 1918, and expressly disclaims special assessment for 1920. In accordance with Rule 62, the inquiry is limited at this stage to whether special assessment is indicated by the evidence, leaving for further presentation and consideration the data in respect of comparative corporations and the measure of the profits tax. The respondent, after traversing most of the substantial items which petitioner seeks to include in invested capital, has also denied special assessment and has omitted to determine a comparative rate. The petitioner invokes subdivisions (a), (c), and (d) of section 327.[1]

Since the use of the special assessment method expressly removes from consideration the proper computation of invested capital, it is important first to determine whether special assessment is required. If it is, the numerous and complicated controversies as to items affecting statutory invested capital under section 326 are beside the point and disappear from consideration. The case would thus be reduced at this stage to the propriety of special assessment and the determination of the correct net income, involving numerous income items in dispute. Cf. *Heiner* v. *Diamond Alkali Co.*, 288 U. S. 502.

After considering all the evidence bearing upon special assessment, and making the findings which it establishes, it is our opinion that

---

[1] SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock or for stock and bonds and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

invested capital can not be determined. The respondent insists that it can be determined and that he has determined it, with a presumption of correctness. But his invested capital is computed upon the theory that all doubtful items, and all which can not be exactly measured in money, should be excluded, and that since the residue is definite, his figure must be taken as the statutory invested capital. This attitude would entirely defeat the special provision. While it might be true that a failure to prove an item of invested capital would necessitate its exclusion under section 326 and that section 327 is not a mere means of escape from such proof, still when it appears from the evidence, if fairly considered, that there are undoubtedly items of substantial value which in their nature or circumstances can not be reduced to exact figures, although within the contemplation of the statutory concept of invested capital, the ground is laid for a finding that invested capital can not be determined. The very existence of subdivision (a) is a recognition of such a situation and the Commissioner may not stultify the statutory purpose by ignoring the indeterminables entirely and computing the tax upon an invested capital restricted to the items discoverable with definiteness. There is nothing in the language of the subdivision which is optional with either the taxpayer or the Commissioner, or which gives the Commissioner a discretion. It provides a simple test—Can the statutory invested capital be determined? If a substantial part of the value of the assets which make up invested capital cannot be stated in monetary terms, the provision applies.

As shown by the findings and the evidence, there are numerous points in the complex composition of invested capital at which one gropes for a figure with which to express the measure of an item the existence of which is indubitable. The Waters Pierce good will alone is an item of unquestionable magnitude. While the figures urged by the petitioner and testified by witnesses who computed value by a formula can not be wholly accepted because of their omission of circumstances which would clearly influence the result, the reality of substantial intangible value in the business can not escape recognition. The value of the Mexican Fuel shares or of the Combustibles shares or of the Combustibles property all elude definite valuation at any of the dates when such valuation would be significant in the consolidated invested capital. The evidence forbids an affirmative finding that the Mexican oil leases were of no value whatever, and yet it affords no satisfactory proof of a definite figure. This indefiniteness is carried into the Combustibles shares and into the Mexican Fuel shares, to say nothing of other uncertain influences affecting the values of those shares besides the oil properties. The extent to which the Pierce Fordyce business and properties should be properly

reflected is involved in the utmost uncertainty which defies clear analysis.

It has been held in other types of controversy that when tax rights and obligations depend upon an ultimate fact, such as March 1, 1913, value or the amount of deductible expenses, the Board may not say simply that a finding is impossible, but must make the best finding it can from the evidence at hand. This doctrine, however, does not control the present case, because the statute in plain terms contemplates and provides for cases where invested capital can not be determined, and directs the use of the special assessment method. It is therefore as much a duty in such a case to find that the figure can not be determined as it is in the other class of cases to find the figure which the statute requires. The situation in a case of such complexity as this, with its various historical details and its myriad of interrelated facts which touch each other at different times and with varying effects, is not susceptible of the same treatment as a simple question in respect of a single date of a small business. The right of a party in the simple case to have a definite finding consonant with the evidence is not inconsistent with a finding of impossibility in the complex case.

The statute provides, in subdivision (b), for special assessment in the case of a foreign corporation. Such a one is Combustibles, an integral part of the intercorporate structure. As to it, the direct owner during each of the taxable years of the oil leases in Mexico, special assessment must be applied, *Josiah Wedgwood & Sons, Ltd.*, 3 B. T. A. 355; *John Hood & Co.*, 3 B. T. A. 1106. It is a nice question whether, while the valuation of the foreign properties is expressly precluded as to the owner, it is required or permitted as a means of valuing its shares in the hands of a domestic corporation, a foreign corporation being also excluded from participation in a consolidated return (sec. 240). This question needs no answer now.

The Waters Pierce properties paid in to Pierce Oil in 1913 and the Pierce Fordyce properties paid in to Pierce Oil in 1918, both were mixed aggregates of tangibles and intangibles paid in for stock, cash and obligations. Although subdivision (c) deals with such property paid in for stock or for stock and bonds, it has been construed as applying to stock and cash, *Christopher* v. *Commissioner*, 55 Fed. (2d) 530, and its intendment would clearly justify reading the word bonds to include notes or other future obligations. From the impossibility of determining the invested capital in respect of Waters Pierce property in 1913 and Pierce Fordyce property in 1918, it must be recognized that there is a further impossibility of determining an allocation between tangibles and intangibles and as between stock and other consideration.

The language of subdivision (d) of the statute precludes at this stage of the consideration a definitive determination, but it is nevertheless of some importance that the present record indicates the probability that this subdivision is applicable. While it cannot be said, in the absence of comparative data, that there is any gross disproportion between the data of this petitioner and those of comparable taxpayers, or that the petitioner is subjected to exceptional hardship in the light of such comparison, cf. *Heiner* v. *Diamond Alkali Co., supra,* there is still prima facie indication that the petitioner is within the subdivision. As shown by the findings, the ratio of consolidated invested capital (respondent's determination $5,797,-811.65) to the total capital, both invested and borrowed ($24,074,-363.78), is less than 25 percent (24.082); the ratio of net income (respondent's determination $3,375,238.91) to the same figure of consolidated invested capital is over half (58.215 percent); and the ratio of profits tax (respondent's determination $2,233,966.19) to net income (respondent's determination) is about two thirds (66.186 percent). For 1919 the ratio of respondent's consolidated invested capital ($12,514,399.61) to the total capital invested and borrowed ($28,519,487.14) is 43.880 percent; net income ($3,474,653.16) is 27.765 percent of respondent's consolidated invested capital; and respondent's determined profits tax ($688,454.89) is 19.813 percent of respondent's determined net income. For 1920 the ratio of consolidated invested capital (respondent's determination $24,920,501.23) is 68.340 percent of total capital invested and borrowed ($36,465,-026.91); net income (respondent's determination $3,732,436.80) is 14.977 percent of consolidated invested capital (respondent's determination); and profits tax (respondent's determination) is 9.301 percent of net income (respondent's determination). The reversal in the ratio of respondent's consolidated invested capital to total capital invested and borrowed, as between 1918 and 1920, is largely attributable to the reduction in long term borrowings through refunding of debentures with preferred stock, as will be more completely described in the discussion of a later issue as to the effect of such refunding upon the deductions for amortization of discount. In the nature of things, it is impossible to say definitely the extent to which the large earnings derived by the petitioner during these years were influenced by or attributable to the use of these large borrowings; but it is clear that the influence was real and substantial, and there is no sensible justification for treating the earnings of all these years as in normal relation to such capital as may properly be included within statutory invested capital. Under such circumstances the use of an inordinately large amount of borrowed funds is a factor indicating the applicability of subdivision (d). The percentage ratios which have just been set forth result from the use of several figures

found in the respondent's determination, each of which is in controversy, and to such extent the ratios may be defective; but the abnormality is still clearly indicated despite such adjustment as may be necessary in the respondent's figures.

Another situation often regarded as justifying the application of special assessment is that of a substantial value of intangible assets which, although substantially responsible for earnings, is, by the strict language of the statute, excluded from invested capital either by reason of the statutory percentage limitation of section 326(a) (4) and (5) or because the true value, although unmistakably existing, can not be definitively stated in figures. Such a situation appears in the findings and the respondent's determination of consolidated net income and invested capital. The figures are as follows:

|  | Invested capital (Respondent's determination) | Net income (Respondent's determination) |
|---|---|---|
| 1918 | $5,797,811.65 | $3,375,238.91 |
| 1919 | 12,514,399.61 | 3,474,653.16 |
| 1920 | 24,920,501.23 | 3,732,436.80 |
| Average | 14,410,904.16 | 3,527,442.96 |

The application to these figures of various mathematical formulae often used for this purpose results in a clear indication of a substantial value for intangible assets. For example, if to the foregoing average income of $3,527,442.96 is applied the formula of 8 percent return on tangibles with a 15 percent capitalization rate for intangibles, it is found that $2,374,570.63 becomes the earnings on intangibles, which, capitalized at 15 percent, would indicate an intangible value of $15,830,470.87. If, however, the 8 and 15 percent formula be regarded as too conservative, a 10 and 20 percent formula similarly applied would indicate $2,086,352.34 as the earnings upon intangibles, giving an indicated capitalized value of $10,431,762.70. Even an extremely short term formula of 15 and 25 percent would indicate $1,365,807.34 as earnings applicable to intangibles and a capitalized value of $5,463,229.36. Similar computations could readily be made for each year separately. Although we need not lay down any rule approving the use of these formulae for the definite ascertainment of intangible value, they may properly be resorted to in corroboration of the statement that a large although undeterminable intangible value existed in all the years in question, which, by reason of the restrictions of the statute, was excluded from invested capital, with a consequent serious effect upon the petitioner's profits tax.

Looking alone at subdivision (d), we are therefore of opinion that by reason of both the inordinately large amount of borrowed funds and the large but uncertain value of intangibles, special assessment

is proper. This we think is sufficiently clear to make it unnecessary to explore the record further to determine whether other conditions exist to support the use of subdivision (d).

Thus it appears that in one respect or another the subdivisions (a), (c), and (d) of section 327 are properly applicable. Since in situations covered by subdivisions (a) and (c) the use of special assessment is mandatory, as it has been held to be as to (b), *Josiah Wedgwood & Sons, Ltd., supra; John Hood & Co., supra,* it must be applied in each of the years covered by the same statute, 1918, 1919, and 1920.

It remains to determine the disputed items of net income, in order that the correct net income can be computed, and thereafter the comparable representative corporations may be brought forth in compliance with section 328. *Heiner* v. *Diamond Alkali Co.,* 288 U. S. 502.

## II.

### Breach of International & Great Northern
### Railway Contract.

Findings.—In 1919, Pierce Oil made a contract with the Director General of Railroads and the receiver for the International & Great Northern Railway Co. to deliver oil for a year to the railroad at a fixed unit price. In 1920, Pierce Oil deliberately broke this contract by refusal to deliver at the contract price. Suit for damages was brought against it in 1920. Petitioner defended the suit, denied liability, and the case went to trial after 1920. No reserve for possible liability was set up on the books until 1922. Judgment was entered by the trial court in 1923 against Pierce Oil for $2,088,483.40, and for Pierce Oil on a counterclaim for $33,150.06. Pierce Oil appealed, and in 1924 settled by paying $1,555,425.

Opinion.—The petitioner contends that its gross income for 1920 must exclude or its deductions must include an amount, pleaded as $1,801,474.09 and in its brief reduced to $1,449,529.51, said to represent profits on oil wrongfully diverted. The case is controlled in principle by *Lucas* v. *American Code Co.,* 280 U. S. 445; *North American Oil Consolidated* v. *Burnet,* 286 U. S. 417; *Brown* v. *Helvering,* 291 U. S. 193; *Pharr* v. *Commissioner,* 56 Fed. (2d) 832. Petitioner cites *Continental Tie & Lumber Co.* v. *United States,* 286 U. S. 290; *United States* v. *Anderson,* 269 U. S. 422; *Niles Bement Pond Co.* v. *United States,* 281 U. S. 357; *Uncasville Manufacturing Co.* v. *Commissioner,* 55 Fed. (2d) 893. They do not cover similar situations. The *Continental* case held that an amount received in 1923 as guaranteed income for 1920 was taxable in 1920 when the taxpayer's books contained the data for calculating the statutory

award.  Here the petitioner in 1920 received the amount which it seeks to exclude from income, and the fact of its liability was neither admitted nor taken into its accounts.  Furthermore the quantum of its liability was not a mere matter of indisputable calculation from petitioner's own books, but depended upon the extent of the plaintiff's actual damage, computed not so much with regard to the amount for which petitioner sold its oil to others as with regard to the amount which the plaintiff would have been required to pay for the quantity of oil contracted for—a fact not discoverable from petitioner's accounts.  The *Anderson, Niles,* and *Uncasville* cases all involve the accrual of taxes susceptible of definite ascertainment.  Cf. *Brown* v. *Helvering, supra.*

Petitioner argues that if it may not reduce its net income by way of deduction, its gross income should be regarded as overstated by the amount of the profit derived from the quantity of oil which it sold to others which it was obligated to deliver to the railroad.  But this argument leads no nearer to petitioner's result than the other.  It received the proceeds of its sales to others under a claim of right, and was required, therefore, to return it as its income.  *North American Oil Consolidated* v. *Burnet, supra.*  No trust has heretofore been suggested or recognized, and none may now be conjured as a means of saving petitioner from tax.

### III.

#### Deductions in Respect of the Issuance at a Discount and Retirement of Debentures.

Findings.—On July 1, 1914, Pierce Oil issued $10,000,000 face amount of 10-year 6 percent convertible gold debentures of 1924 and $1,100,000 par value ($25 each) of shares of its common stock, all for $9,375,000 cash.  By the terms of the debentures, the principal amount to be paid at maturity or any earlier redemption date was at the rate of 105, or $10,500,000.  On July 1, 1914, the fair market value of the debentures was $9,300,000 and the fair market value of the shares was $836,000.  The debentures were sold at a discount of $1,898,234.02.  The shares were issued for $773,234.02 cash.

Of the $10,000,000 face amount of debentures, $117,200 were purchased by Pierce Oil in 1918 for $97,410 and retired, $207,900 were purchased by Pierce Oil in 1919 and retired, and some ($477,000?) were apparently retired some time prior to 1918.  In June 1919, $9,197,900 were outstanding.  In 1919 Pierce Oil retired $4,191,700 which were acquired in or about September 1919 in exchange for $4,191,700 par value of preferred shares.  In 1920 Pierce Oil retired the remaining outstanding debentures, having on January 1, 1920, a face amount of $5,006,200, all of which were acquired in 1920 for

$5,256,510 cash. The loss incurred in 1920 by way of unamortized discount is $427,632.26.

OPINION.—Four issues are presented. A contention that an alleged commission of $137,500 was paid to Pierce Oil's president in 1914 and should be the subject of amortization deductions in 1918, 1919, and 1920 is now abandoned by petitioner in its reply brief for want of sufficient evidence to support it.

1. The first problem is the determination of the amount of the deduction in each taxable year for amortization of discount on the debentures. Both parties have adopted an erroneous postulate, in that they measure the total discount at which the debentures were issued in 1914 as the difference between the amount received therefor and the *face* amount of the debentures ($10,000,000). The error lies in treating the face amount as the true amount of the obligation of the debenture. The true amount of the obligation, the amount to be paid at maturity or any redemption date, was at all times at the rate of 105, or $10,500,000. The fact that the manner of its statement was as if the principal amount were 100 and the additional 5 were a premium is of no significance for present purposes. Discount is not measured by the manner in which the obligation is expressed. It is the difference between the amount borrowed and the principal amount to be paid. The crucial factor is the amount which must be paid, *Baltimore & Ohio R. R. Co.*, 29 B. T. A. 368. As shown by the findings, the petitioner sold its obligation to pay a principal amount of $10,500,000, and the discount was the difference between this amount and the less amount received for them. This discount it may amortize ratably over the life of the debentures. *Helvering* v. *Union Pacific R. R. Co.*, 293 U. S. 282.

The next question is, How much did petitioner receive for the debentures in 1914? Cf. *Hummel-Ross Fibre Corporation*, 31 B. T. A. 451. It sold the debentures and 44,000 shares all together for $9,375,000. The most available evidence in the record shows a value of about 93 for the debentures and a value of about 19 for the shares. This is the best evidence the record affords for a ratio upon which to allocate the amount received between the debentures and the shares. The $9,375,000 is thus assigned, $8,601,765.98 to the debentures and $773,234.02 to the shares. The discount thus is found to have been $1,898,234.02. This is amortizable ratably in each year to the extent the debentures were outstanding. The $477,000 face amount eliminated prior to 1918 serves to reduce *pro tanto* the discount deduction for the years in question. The $117,200 face amount retired in 1918 was retired for $97,410. The proportionate annual discount applicable thereto was $2,224.73. Therefore the discount which must be regarded as having been amortized and charged off in years before 1918 is $7,786.65, leaving $14,460.75 unamortized

at the time these debentures were retired. The total deduction for amortization of discount applicable to 1918 thus becomes $193,004.85.

2. The argument as to 1919 turns principally upon the effect of the retirement of the $4,191,700 face amount of debentures. This was done under a detailed agreement with bankers looking to the issuance of new preferred shares. The bankers agreed to take the preferred (except those exchanged for debentures) at 96, provided the petitioner would have the debentures retired. It was expressly that the petitioner agreed with the bankers and offered to the debenture holders to exchange, par for par, preferred shares for outstanding debentures without either the reality or the formality of the intervention of cash. There is nothing in the evidence to support the petitioner's conception of the transaction as a cash disposition of the preferred and a cash retirement of the debentures. Cf. *San Joaquin Light & Power Corporation* v. *McLaughlin*, 65 Fed. (2d) 677; *Helvering* v. *California Oregon Power Co.*, 75 Fed. (2d) 644; *Helvering* v. *Union Public Service Co.*, 75 Fed. (2d) 723. While the economic effect may have been the same, the decision must be controlled by what in fact occurred, however otherwise the same result might have been achieved. *United States* v. *Phellis*, 257 U. S. 156; *Ralph J. Chandler Shipbuilding Co.*, 22 B. T. A. 5, 10; *375 Park Avenue Corporation*, 23 B. T. A. 969, 973; *James E. Wells*, 29 B. T. A. 222, 225.

The exchange by a corporation of its own shares for its outstanding bonds has been considered before, and it has been held that no gain or loss thereby results to the corporation. *Chicago, R. I. & Pac. Ry. Co.* v. *Commissioner*, 47 Fed. (2d) 990; certiorari denied, 284 U. S. 618; *375 Park Avenue Corporation*, 23 B. T. A. 969. Whatever may be said for the deduction of the unamortized discount when the bonds are discharged, even though it be with the proceeds of an issue of new bonds, see *San Joaquin Light & Power Corporation* v. *McLaughlin, supra; Helvering* v. *California Oregon Power Co., supra; Helvering* v. *Union Public Service Co., supra; Great Western Power Co. of California*, 30 B. T. A. 503, it can not apply to the direct exchange of shares for the outstanding bonds. The reason for recognizing discount is the anticipation of payment at maturity of the full amount of the obligation, which amount is greater than the amount originally received. *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289. During the period of the obligation the supposition is indulged that it will be paid in full, and this supposition is what supports the amortization of the discount. *Helvering* v. *Union Pacific R. R. Co., supra.* If the original amount were received for shares instead of bonds, there would be no fixed maturity, no discount, and no

amortization, *Carter Hotel Co.*, 25 B. T. A. 933; affd., 67 Fed. (2d) 642. So, when the obligation of the bond becomes by substitution not a new obligation but a share in the enterprise, the occasion for amortization ceases, and the deductions which have theretofore been justified by an anticipation of full payment must cease with the fall of their supporting hypothesis, *Old Mission Portland Cement Co.* v. *Helvering, supra.* Although the accounting will no doubt change, this does not give reality to a loss.

The unamortized discount applicable to $4,191,700 face amount of debentures may not be deducted in 1919, but must be treated as attributable to the preferred shares. In respect of the $207,900 face amount of debentures retired in 1919 before September, the proportionate annual discount is $3,946.43. The amortization of discount for prior years is $17,758.94, leaving $21,705.35 unamortized. Thus the total amortization deduction is $116,734.74.

The respondent, acting upon the misconception already referred to, that the debentures involved both a discount and a premium, had allowed for 1919 a deduction of the unamortized discount and of the supposed premium, and now claims that this allowance was incorrect. In this view he must be sustained and net income increased accordingly by adding back $430,666.79, the unamortized discount on the $4,191,700 face amount of debentures exchanged for preferred shares.

3. As to the $5,006,200 remaining face value of debentures, which were retired with cash in 1920, the petitioner argues that because it was required by the 1919 agreement with the bankers to call the debentures and, because in 1919 it deposited a fund for such retirement, the actual retirement must be regarded as having occurred in 1919, and the deduction for loss of the unamortized discount allowed for 1919. The respondent, to the contrary, argues that these debentures must be treated like those exchanged in 1919 for preferred shares, since their retirement was part of the entire plan to substitute an issue of preferred shares for the entire issue of debentures. Having allowed for 1920 a deduction of unamortized discount and supposed premium, he pleads affirmatively that this deduction be disallowed and the amount restored to 1920 income.

From the evidence we have found as a fact that the $5,006,200 remaining face amount of debentures was retired for cash at 105 in 1920. There is no room for doubt about this in fact. The fact that the petitioner in 1919 gave notice of retirement and set aside the fund (assuming that the fund was deposited in 1919, an assumption which we can not from the doubtful evidence find as a fact) would not justify the adoption of petitioner's view that 1919 must be treated as the year of retirement. The bankers' agreement, the corporate resolutions, the published notice of call, and the statement to the

Virginia Corporation Commission, all expressly speak of the retirement in 1920. The call for retirement did not change the character of the debentures into what petitioner calls short term notes. They must be treated as outstanding debentures through the entire year 1919.

Just as the facts as to actual exchange in 1919 were controlling to deprive it of any loss deduction, so the facts as to 1920 showing an actual cash retirement must establish petitioner's right to deduct the unamortized discount upon the amount retired. The discount applicable to the period prior to 1920 is $522,661.64, and the unamortized discount to be charged off in 1920 is $427,632.27.

4. While it is not necessary to decide the effect of all this upon invested capital, it is not amiss to say that invested capital for each year would necessarily include the $773,234.02 paid in 1914 for shares, and would include, after the exchange in 1919, the amount originally paid for the $4,191,700 face amount of debentures which by the exchange must be treated as paid in for preferred shares.

## IV.

### WAR AMORTIZATION.

#### A.—Healdton Pipe Line.

FINDINGS.—The Fort Worth refinery was from April 6, 1917, to November 11, 1918, " engaged in the production of articles contributing to the prosecution of the war." From April 2, 1910, to April 15, 1918, it was owned and operated by Pierce Fordyce. It was on April 15, 1918, among the assets conveyed, " as of December 31, 1917 ", to Pierce Oil.

The Healdton pipe line, a common carrier 98 miles long, was constructed in 1917 from the Healdton Field in Oklahoma to the Fort Worth refinery in Texas. The pipe line was as to the Texas portion acquired by Pierce Oil from Pierce Fordyce April 15, 1918, and as to the Oklahoma portion from Pierce Pipe Line Co. of Oklahoma June 15, 1918. Pierce Pipe Line Co. of Oklahoma was organized April 12, 1917, and all its shares were owned by Pierce Fordyce.

On June 25, 1918, Pierce Oil conveyed the entire pipe line to Pierce Pipe Line Co. of Texas, all the shares of which were owned until 1924 by Pierce Oil.

The construction cost of the pipe line was as follows:

|  | In Texas | In Oklahoma |  |
| --- | --- | --- | --- |
| Before April 6, 1917 | $359,401.20 | $121,038.46 | $480,439.66 |
| April 6 to Dec. 31, 1917 | 654,489.97 | 494,269.43 | 1,148,759.40 |
| June 1 to June 30, 1918 | 8,394.36 | 9,954.84 | 18,349.20 |
| July 1 to Dec. 31, 1918 | [1] 2,475.30 | 3,875.21 | 1,399.91 |
| 1919 | 13,826.34 | 13,588.42 | 27,414.76 |
|  | 1,033,636.57 | 642,726.36 | 1,676,362.93 |

[1] Credit.

The Fort Worth refinery was shut down June 1, 1922, and before that the only oil transported through the pipe line went to that refinery and no oil was received at the refinery except through the pipe line. The oil transported was:

|  | Barrels |
|---|---|
| 1918 | 2, 371, 171 |
| 1919 | 1, 152, 723. 80 |
| 1920 | 1, 016, 935. 16 |
| 1921 | 125, 552 |
| 1922 | 131, 794 |

In 1922 the trunk line was drained and holes were punched in the pipes. In 1923 the holes were plugged. Oil was transported through the gathering lines in 1923, and through the trunk line from 1925 to 1928, apparently not to the Fort Worth refinery, but for others to other points for compensation.

Production in the Healdton Field, available for transportation by independent pipe lines such as petitioner's, declined steadily from 1919, and was very slight by the end of 1922 and in 1923.

From 1922 to 1925 substantial efforts were made to sell the pipe line properties, but such efforts were futile.

The Healdton-Fort Worth pipe line was not permanently discarded by Pierce Pipe Line Co. of Texas on or before March 3, 1924.

A claim for deduction for war amortization in respect of the pipe line was filed April 4, 1924.

OPINION.—The petitioner seeks and respondent denies for each year under section 234 (a) (8), Revenue Acts of 1918 and 1921 and section 1209, Revenue Act of 1926, a deduction of what is commonly called war amortization in respect of the pipe line from the Healdton Field to the Fort Worth refinery. Pierce Oil itself was the owner of the pipe line property for but a short period in 1918, although this was in contravention of statutes of both Texas and Oklahoma (Gen. Laws of Tex., 1917, ch. 31; Comp. Okla. Stat. Ann., 1921, ch. 68, art. III, sec. 7945). It nevertheless claims the deduction on the consolidated return as one available to the affiliated group. It regards the pipe line as an accessorial facility of the Fort Worth refinery, which is stipulated to be a war facility within the amortization provision, and says that the amortization as to the refinery carries with it the amortization of the pipe line. The evidence shows that the pipe line was performing the service of a common carrier under tariffs filed with the Interstate Commerce Commission and that it made regular reports to the Commission. Except for the short period of its ownership by Pierce Oil it was separately owned. This was not adventitious, for state law required it. The separate ownership may not be disregarded for present purposes any more than for other purposes, *Burnet* v. *Clark*, 287 U. S. 410, *Planters*

*Oil Co.* v. *Hopkins*, 286 U. S. 332. While owned by other corporations, the pipe line may not be regarded as an operating facility of Pierce Oil, *Walker* v. *Gulf & I. R. Co. of Texas*, 269 Fed. 885.

Despite their participation in a consolidated return, the separate corporations are still to be treated as separate taxpayers. *Woolford Realty Co.* v. *Rose*, 286 U. S. 319; *Planters Cotton Oil Co.* v. *Hopkins, supra; Delaware & Hudson Co.* v. *Commissioner*, 65 Fed. (2d) 292. The deductions available to each in the determination of its taxable net income are to be applied only to it and not to its affiliates. The unitary concept of the affiliated group recognized in some of the earlier decisions, *American La Dentelle, Inc.*, 1 B. T. A. 575; *G. M. Standifer Construction Corporation*, 4 B. T. A. 525; *U. S. Refractories Corporation*, 9 B. T. A. 671; *Federal Development Co.*, 18 B. T. A. 971, has been definitely repudiated and for present purposes those decisions are not authoritative. The word taxpayer in the amortization section must be taken to mean each separate corporation of an affiliated group and not the group as a unit.

Separately treated, there is no foundation in the record for an amortization allowance to Pierce Oil. The larger part of the line, that lying in Oklahoma, was constructed by either Pierce Fordyce or Pierce Pipe Line Co. of Oklahoma between sometime before April 6, 1917, and January 1, 1918. Pierce Oil acquired it in June 1918. No figure can be determined as its cost. This is likewise true of the Texas portion which it acquired among the assets of Pierce Fordyce by deed of April 15, 1918. All was conveyed to the Pierce Pipe Line Co. of Texas later in June 1918 for all that corporation's capital stock, the actual value of which, as distinguished from par, is likewise not shown by the record.

There is however another view which as a matter of law precludes the claimed deduction in any event. The pipe line is a transportation facility, separately owned and operated as such. Without attempting to say whether one who owns a short pipe line as a minor and incidental plant facility adjunct to a refinery which he owns and operates is entitled to treat it as part of the producing plant, we follow well reasoned authority in holding that a pipe line engaged primarily in the business of transportation is not within the terms or implications of the amortization provision. *Texas Pipe Line Co.* v. *United States*, 58 Fed. (2d) 852; certiorari denied, 288 U. S. 604; *Hampton & L. F. R. Co.* v. *Noel*, 300 Fed. 438. Had there been doubt as to whether transportation facilities were intended to be included, that doubt would fall before the fact that vessels were specifically mentioned. The inclusion of vessels, *eo nomine*, implies the exclusion of other transportation facilities, *Hampton & L. F. R. Co.* v. *Noel, supra*. The petitioner has made a valiant effort to find

distinguishing circumstances in the *Texas Pipe Line* decision, *supra*, but we find nothing to persuade us that the learned court would have found in them reason to reach a different decision.

Factually we can not find from the evidence that the pipe line was permanently discarded, or " abandoned ", as the parties express it, before March 3, 1924. The evidence as to the draining and punching of the trunk line in 1922 is no more indicative of abandonment than the plugging in 1923 and the subsequent use are of nonabandonment.

What the " value in use " was after the amortization period we have not attempted to determine because in our opinion the deduction was properly disallowed as a matter of law.

### B.—Ranger Pipe Line.

FINDINGS.—Pierce Oil, having acquired from Pierce Fordyce on April 15, 1918, oil leases in the Ranger Field in Texas, began in August 1918 the adoption of a program for their development, primarily for the purpose of supplying crude oil to the Fort Worth refinery. This program included drilling, production, storage, and transportation and was covered by proper corporate authorization.

Before the Armistice on November 11, 1918, some work in the field had been begun. The only purchases actually contracted for prior to that date were for 13 miles of line pipe, to be supplied by the South Chester Tube Co. at fixed prices aggregating $35,262.15. This pipe was actually shipped, and apparently paid for, between November 8, 1918, and January 10, 1919. All other expenditures in respect of the Ranger pipe line were contracted for and made after November 11, 1918. The total expenditures were $665,708.39,

In July 1919 the chairman reported to the board of directors that the corporation, being still without production in the Ranger Field, " must expend large additional sums to accomplish what is essential to the corporation's complete success."

On November 29, 1921, Pierce Oil sold the Ranger pipe line, together with other properties, to Pierce Pipe Line Co. of Texas, all for the latter's note for $3,000,000. Pierce Oil owned all the shares of Pierce Pipe Line Co. of Texas. The transfer of the Ranger pipe line was accounted for on the books of both Pierce Oil and Pierce Pipe Line Co. of Texas as a sale for $1,094,913.38, an amount substantially in excess of the cost of this property to Pierce Oil.·

Production in the Ranger Field began to decline in the latter part of 1922, and transportation thereof ceased in the summer or fall of 1923. As of March 1, 1924, the books of the Pierce Pipe Line Co. of Texas showed an investment in the Ranger pipe line property of $993,633.89. In 1924 much of the property was sold or otherwise salvaged, and at December 31, 1924, the aforesaid in-

vestment account had been reduced to $26,941.70, which amount was charged off in December 1925.

OPINION.—Pierce Oil seeks a deduction in 1919 of $566,608.59 as war amortization of the cost, less salvage, of the Ranger pipe line. It urges that the Ranger properties were acquired and the pipe line was constructed solely as a means of supply for the Fort Worth refinery, and since the refinery is stipulated to have been engaged in the production of articles contributing to the prosecution of the war, that the pipe line must likewise be so regarded, as an adjunct of the refinery.

There are, in our opinion, several reasons why the deduction is not allowable. The pipe line can not be regarded as a facility for the production of articles contributing to the prosecution of the war, within the intendment of the statute. Even assuming that its construction was a war incident rather than a normal business project which happened to be started during the war period, it was still not frustrated by the Armistice so as justly to require an allowance by way of deduction for the loss or diminution of the investment. Prior to the Armistice the petitioner had made no expenditures, and the only obligation to which it had been legally committed was the purchase for $35,262.15 of pipe which had not then been delivered. It could then have ended the Ranger project at once and disposed of the pipe. The corporation's mere voluntary program was not a legal commitment to a war project. While undoubtedly the amortization deduction provision was intended as a special measure to relieve taxpayers within the described class and should not be so strictly or literally construed as to narrow its effect upon those within its alleviatory purpose, there can be no such liberality of construction as to bring within it taxpayers or their facilities not normally within its terms or implications, *United States* v. *Briggs Mfg. Co.*, 40 Fed. (2d) 425; *Walcott Lathe Co.*, 2 B. T. A. 1231; *John Polachek*, 8 B. T. A. 1; *B. F. Sturtevant Co.*, 26 B. T. A. 598. Where the program of war production was so far advanced at the time of the Armistice that its own momentum carried the expenditures into the post-war period, it was held that such post-war expenditures as could not reasonably be avoided were within the purpose of the amortization statute and subject to the deduction. In *United States Refractories Corporation*, 9 B. T. A. 671, 689, it was said:

* * * It appears that certain expenditures on account of some of the facilities were made subsequent to November 11, 1918, and in the year 1919, but the evidence is clear that all the equipment was constructed pursuant to a plan of expansion determined upon in 1917 after April 6, and that the expenditures made in 1919 were necessary to the completion of construction theretofore begun, which would have been totally lost unless completed. In this circumstance we believe the expenditures subsequent to December 31, 1918, should be included in the computation of amortization.

But this does not require the amortization of the cost of facilities in a program voluntarily and persistently carried on despite the Armistice and which could, for all this record shows, have been either avoided or at least substantially offset if an attempt had promptly been made.

It has already been said in considering the Healdton pipe line that a pipe line transportation facility may be deprived of amortization because not used for production, *Texas Pipe Line Co.*, *supra.* The productive character of the Fort Worth refinery to which the Ranger oil was to be supplied can not be attributed to the Ranger pipe line.

Moreover, the pipe line was in 1921 sold by Pierce Oil to Pierce Pipe Line Co. of Texas for an amount in excess of cost, if the accounting entry of $1,094,913.38 be adopted. And if it be regarded as a mere book entry of no substance, then the sale for an unknown portion of $3,000,000 also defeats the claim for amortization. As to Pierce Pipe Line Co., no claim is made, and none properly can be made, since it acquired the property after November 11, 1918. And as to the affiliated group, it has been said as to the Healdton line that no group claim is cognizable.

In our opinion, no amortization deduction is allowable, and it is not necessary to consider post-war value in the light of the evidence.

### C.—Texas City Refinery.

Findings.—All of the facilities of the petitioner at its Texas City refinery other than the equipment and facilities used for the purpose of processing and compounding oils and greases or facilities incidental thereto were " abandoned " by the petitioner prior to March 3, 1924. A reasonable allowance for amortization of such facilities in 1918 is $130,953.77.

Opinion.—The only controversy remaining for decision as to the amount of amortization properly deductible in respect of the Texas City refinery is whether so much of the plant as was not used in the compounding of oils and greases was " abandoned " before March 3, 1924. The parties have stipulated in writing that if it was, the proper allowance is $130,953.77, and that if it was not, the proper allowance is $50,889. Both the stipulation and the testimony are to some extent ambiguous and require interpretation. We have considered them with a view to applying the statute to promote its clear purpose, ascertaining the intention of the parties upon the assumption that they wanted to submit the basis for a fair dispute, and gathering from the testimony an understanding of the substantial facts. The finding in the language of the stipulation is the result.

## V.

### GAIN IN RECEIPT IN 1918 OF PIERCE FORDYCE ASSETS.

FINDINGS.—In December 1917 Pierce Oil acquired 31,550 Pierce Fordyce certificates for 145,130 Pierce Oil shares having a par value of $25 each and an actual value of $10.60 each. Before June 28, 1918, Pierce Oil acquired the remaining 4,473 Pierce Fordyce certificates for 14,320 Pierce Oil shares of $10.60 each, actual value, and $305,582.60 cash and notes. The total cost to Pierce Oil of all (36,023) Pierce Fordyce certificates was $1,995,752.60.

On April 15, 1918, Pierce Oil, in the liquidation of Pierce Fordyce, acquired the assets and assumed the liabilities of Pierce Fordyce. The fair market value of the net assets on December 31, 1917, was at least $4,291,832.80; net earnings from January 1 to April 15, 1918, undistributed, were $528,422.77. The fair market value of Pierce Fordyce net assets on April 15, 1918, exclusive of net earnings for the period January 1 to April 15, 1918, was $4,291,832.80. The gain derived by Pierce Oil was $2,296,080.20.

OPINION.—This issue is raised by the respondent as new matter in an amended answer and arises as a corollary to an issue raised by the petitioner demanding that its invested capital include the value of the Pierce Fordyce assets when acquired by Pierce Oil. There is little room for dispute as to the facts, but each party seeks the equivocal effect of restricting their use to its own advantage. As invested capital and its problems disappear in view of special assessment, it is unnecessary to decide the petitioner's claim. But since respondent's claim relates to net income, it must be decided; and must, in our opinion, be sustained. The opposition is too strained to be effective.

It is of no moment that Pierce Fordyce was not a corporation but an unincorporated association, for the statute has expressly included it within the definition of corporation, and the statute is valid. *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110. It is thus to be treated as a corporation for all purposes of the revenue act, including that prescribing consolidated returns. *California Brewing Association*, 5 B. T. A. 347. This the petitioner recognized when it filed the original consolidated return. Its certificates of proportionate interest are treated as corporate shares. Petitioner would limit the influence of the *Burk-Waggoner* decision to considerations affecting the tax of the association, and urges that the association may not be treated as a corporation in determining the tax of the shareholder. But Congress intended no such exception. Section 201 (a) treats of distributions for the purpose of determining the tax not alone of the distributing corporation, but also of the receiving

shareholder, and provides that the term dividend "means (1) any distribution made by a corporation * * * to its shareholders *or members* ", thus bringing within its intendment not only those who may be strictly called shareholders of a corporation, but also those who by reason of the form of their organization are designated "members." It is also said that Pierce Oil by acquiring the association certificates immediately became *pro tanto* the owner of the direct interest in the assets, the liquidation of which can not be called a realization of income. But this depends on whether for purposes of the revenue act the association is to be treated pluralistically. The *Burk-Waggoner* decision holds that it is not. And it matters not how Texas law treats it. *Burnet* v. *Harmel*, 287 U. S. 103; *Palmer* v. *Bender*, 287 U. S. 551. But even though Texas should for some purposes and in some circumstances apply partnership law to such an association, no one could say that the association is an "ordinary partnership" and it is only to such that the partnership provisions of the statute are applicable. *Burk-Waggoner Oil Association* v. *Hopkins, supra*.

When Pierce Oil acquired the certificates for some of its own shares, the cost of the certificates acquired was the actual value of the shares given up. *Farmers Cotton Oil Co.*, 27 B. T. A. 105, 115; *Ambassador Petroleum Co.*, 28 B. T. A. 868, 873; *Holmby Corporation*, 28 B. T. A. 1092, 1105. Although it has been held that where a corporation issues all its shares for property, the value of the shares is measured by the value of the property, this is merely because the value of the property received is the only available measure of the cost. Obviously it has no application where many shares were already outstanding representing other property and such shares have a determinable value.[2] What the value is in any case is to be determined by evidence, and a formula is only recognized at law as a makeweight or as a last resort. There is in this record substantial evidence as to actual value of Pierce Oil shares, and from a full consideration of it all, the value of $10.60 a share for each of the 159,450 shares given up has been found as a fact. Adding to this the value of $305,582.60 of cash and notes given for some of the certificates, the total cost of the certificates is found to have been $1,995,752.60.

It should be clear from what has been said that, in determining the figure of cost to Pierce Oil of the certificates, we have not thereby determined the cost to Pierce Fordyce of its assets, *Regal Shoe Co.*, 1 B. T. A. 896, nor the value at the time of transfer of either the Pierce Fordyce shares or the Pierce Fordyce assets, nor have we regarded this transaction as one involving gain or loss to Pierce Oil.

---

[2] There is in *Regal Shoe Co.*, 1 B. T. A. 896, an unnecessary dictum that "the actual value of the stocks at the time the taxpayer acquired them for its own stock" is to be taken as cost. This was incorrect and has never been followed.

Thus there is no occasion for an argument whether a corporation realizes gain or loss by issuing its shares at a discount. The considerations which are involved as to acquisition of Pierce Fordyce certificates in 1917 are the same as they would be if the acquisition had occurred when the contract was made in 1914, and the certificates had been held without liquidating Pierce Fordyce until 1918. Clearly such transaction would have served only to establish the cost to Pierce Oil of the Pierce Fordyce certificates, and such cost would have been determined by the value of the Pierce Oil shares and cash and notes paid. The contention of petitioner that when Pierce transferred his Pierce Fordyce certificates to it the transaction was not at arm's length, but that Pierce either was squeezed by the bankers or was generously making a gift to Pierce Oil of an excess value (cf. *Robinson* v. *Commissioner*, 59 Fed. (2d) 1008), is not supported by anything in the record.

By the acquisition in 1917 of almost all of the Pierce Fordyce certificates by Pierce Oil, the two became affiliated and a consolidated return was required, Revenue Act of 1918, sec. 240, although this was but for the purpose of computing tax and left the participating entities no less liable as separate taxpayers, *Woolford Realty Co.* v. *Rose*, 286 U. S. 319. When, however, Pierce Fordyce was, in 1918, completely liquidated, albeit not formally dissolved, and Pierce Oil, as its shareholder, received its assets in lieu of its certificates, this gave rise to gain or loss measured by the difference between the investment in the certificates and the actual value of the liquidated assets. *Burnet* v. *Aluminum Goods Mfg. Co.*, 287 U. S. 544; *Burnet* v. *Riggs National Bank*, 57 Fed. (2d) 980; *Canal-Commercial Trust & Savings Bank* v. *Commissioner*, 63 Fed. (2d) 619; see also *McLaughlin* v. *Pacific Lumber Co.*, 293 U. S. 351.

This value is, for the purpose of this record, practically agreed upon. To establish invested capital, petitioner alleged and has persistently reiterated that on December 31, 1917, it was $4,291,832.80. It introduced evidence that the trend of prices was steadily upward. The earnings accumulated between January 1 and April 15, 1918, were $528,422.77, and no distributions were made in that period. This amount presumably has been included in consolidated income and already taxed, and should not again be used to determine gain or loss, *McLaughlin* v. *Pacific Lumber Co.*, *supra*. The respondent admitted that the value on December 31, 1917, was no less than $4,291,-832.80, pleaded affirmatively that gain had been realized measured by the true value of the assets received over cost, and made claim for an increase in the deficiency, as he was permitted to do. Revenue Act of 1932, sec. 272 (e). Though respondent had the burden of establishing his affirmative allegations and sustaining his new claim, the mutual allegations in both pleadings are as forceful as evidence. It

has been found, therefore, that the net value of the Pierce Fordyce assets when received by Pierce Oil, on April 15, 1918, was $4,291,-832.80, which was $2,296,075.20 in excess of cost. This was a taxable gain.

The petitioner argues that the liquidation must be attributed to 1917 because the assets were taken over " as of December 31, 1917." This form of words, whether for the purpose of accounting or otherwise, can not outweigh the fact that it was not until April 5, 1918, that the directors resolved to acquire them and not until April 15, 1918, that the transfer was made. It is further argued that the effect mathematically is to tax as gain the discount upon the issuance by Pierce Oil of its own shares. If so, this is an adventitious result of the figures in evidence and has no bearing upon the decision.

## VI.

### DEPRECIATION.

#### A.—Waters Pierce Properties.

The petitioner claimed that, in determining the deficiency, respondent had erroneously reduced the depreciation base in respect of the properties acquired in 1913 from Waters Pierce. The amount of the improper exclusion of depreciable assets has not been pleaded, was stated at the hearing to be less than $200,000, was argued in the opening brief to be $191,500.71, and was conceded in the reply brief not to be shown by the record. As to the tangible assets, the only evidence of actual value greater than that determined by the Commissioner is as to three parcels of land in St. Louis. Land, however, is not a depreciable asset. The alleged error is therefore not supported and the respondent's determination is sustained.

#### B.—Pierce Fordyce Properties.

The complaint in this issue is that in determining depreciation the Commissioner "did not use the true depreciable basis of the assets acquired by petitioner from Pierce Fordyce as of December 31, 1917." This requires an exploration of the evidence to support findings as to the nature and extent of depreciable assets acquired and the cost or other proper figures to be used as their depreciation basis. To such figures the undisputed rates are to be applied.

It has been held above that the properties of Pierce Fordyce were acquired by Pierce Oil not on December 31, 1917, but on April 15, 1918, and their value when so acquired was, by virtue of the pleadings, found to be $4,291,832.80, plus earnings of $528,422.77, a total of $4,820,255.57. This figure is net, and covers all assets, tangible and intangible, depreciable and nondepreciable, and hence is no

criterion of depreciation. The notice of deficiency shows that, with certain adjustments, the respondent used book values of Pierce Fordyce assets on Pierce Fordyce books at the time of transfer in 1918 as the bases for depreciation. By pleaded allegation and pleaded admission it is agreed that actual value was at least book value. The evidence contains nothing better than this, and upon it the following finding is made.

FINDINGS.—On April 15, 1918, Pierce Oil acquired, among the assets of Pierce Fordyce, the following groups of depreciable properties having values at that date as listed, such figures being the proper bases to be used in determining a reasonable allowance in each year, 1918, 1919, 1920, for exhaustion, wear and tear, including obsolescence.

| | |
|---|---:|
| Buildings, plant and equipment | $2,687,555.62 |
| Tank cars | 945,752.50 |
| Stable and garage equipment | 112,653.86 |
| Iron barrels and drums | 211,736.50 |
| Drilling tools and equipment | 49,615.83 |
| | 4,007,314.31 |
| Less: Reserve for depreciation | 256,247.04 |
| | 3,751,067.27 |

*C.—Incomplete Construction.*

The Commissioner reduced the depreciation base for buildings, plant and equipment in the amounts of $104,499.13 for 1918, $760,223.45 for 1919, and $142,080.47 for 1920. By written stipulation, the parties have agreed that the following figures may properly be substituted for those just stated: $52,249.56 for 1918; $380,111.73 for 1919; and $71,040.23 for 1920.

*D.—Basis for Depreciation upon Amortizable War Facilities.*

Although factually the issue here is somewhat obscure, the parties have, by stipulation and by their arguments, reduced the controversy to two questions of principle, from the decision of which a correct recomputation can be made. The respondent, in his determination of the 1918 depreciation base, excluded therefrom assets upon which an allowance for war amortization had been permitted to be deducted. The exclusion was not limited to the amount of the amortization deduction by which the cost was reduced, but went to the extent of excluding the entire cost of the asset, although only part of the cost had been deducted as amortization. Thus by the respondent's computation there remains a balance of cost after amortization, and the exclusion means that no depreciation whatever has been applied against the asset.

From the notice of deficiency, it is reasonably plain that this is what the respondent did. But he now shifts the argument by contending that his deduction for war amortization may in fact have included a measure of depreciation and that it must be assumed, consistently with his regulations, that proper depreciation was included in the deduction, irrespective of its label as amortization. We find nothing in the record to support this abnormal construction of the respondent's own determination. If an attack upon a failure to allow depreciation may be met by the mere statement that depreciation may have been included in the amortization allowance, the integrity of any statement in the determination of the deficiency would be thrown into doubt. For, if amortization covertly included depreciation, it may likewise have included repairs, or even bad debts; and, the nature of the item being thus thrown into dispute, an unconscionable burden would be cast upon a contestant of proving consecutive negatives which would run the gamut of the revenue act. The Commissioner has allowed certain amounts for war amortization of certain described facilities, and he has omitted in the same itemized computation to allow any depreciation in respect of such facilities. From this the taxpayer is justified in believing that the allowance represents solely a computation of the statutory amortization.

Upon the question of the propriety of a depreciation allowance based upon the remainder of cost after amortization has been deducted, there is little room for legal controversy. The amortization deduction has served to remove the excessive war cost from the investment in capital facilities. What is left is to be regarded as the normal capital cost. Therefore, as in respect of all other capital assets, the cost is to be taken as the base of such depreciation deductions as are otherwise reasonably allowable; and this is just as true in respect of the year during which amortization is allowed as of any other year. For 1918, therefore, the remainder of the cost of war facilities upon which an amortization allowance has been deducted is to be treated as a depreciation base. *United States Cartridge Co.* v. *United States*, 284 U. S. 511; *Diamond Alkali Co.* v. *Heiner*, 60 Fed. (2d) 505.

For 1919 and 1920 the Commissioner allowed a depreciation deduction upon the assets which had been partly written off through amortization allowed for 1917 and 1918. The petitioner, however, contends that these depreciation allowances are inadequate because they are based, not upon original cost, but upon the remainder after amortization. The theory of the amortization allowance makes the fallacy of this contention obvious. The function of both deductions for amortization and depreciation is only to permit an assurance that capital cost will be recovered out of income before tax, the depreciation deduction permitting a *pro rata* annual recovery over the period

of useful life and the amortization deduction a prompt recovery of the excess war cost. The petitioner's demand is for a double recovery of the same cost. Once the cost is reduced by an amortization allowance it is taken from the depreciation base, and the remainder alone is a permissible base for future depreciation. For 1919 and 1920 the respondent's determination as to the items assailed in this issue is sustained. *United States Cartridge Co.* v. *United States, supra; Pratt & Letchworth Co.*, 7 B. T. A. 492.

### E.—*Various Depreciation Matters Stipulated.*

In a group labeled Issue No. 5, the parties have stipulated a rate of 7 percent applicable to certain buildings, plant and equipment, 8 percent to the vessel, *Mexicana*, the basic amount for depreciation of certain steamers and barges, and the specific amounts to be added to the depreciation allowances on stable and garage equipment. These stipulations remove such items from controversy and require no further consideration or decision. Depreciation and obsolescence upon the *Pennant* is separately considered.

### F.—*Depreciation and Obsolescence on Tank Ship "Pennant."*

FINDINGS.—The tank ship *Pennant* was acquired by the petitioner when it was constructed in 1916. The stipulated fact is that at December 31, 1917, the correct base for depreciation was $1,171,-122.71. It is stipulated further that for 1918, 1919, and 1920 the figure to be taken as the depreciation base is $1,177,580.20, adjusted by an amortization allowance made for 1918 of $11,549.45. A normal depreciation allowance has been recognized of 4 percent.

From the beginning, the *Pennant*, a tank vessel, powered with two Bolinder semi-Diesel motors, was inefficient. In 1918, 1919, and 1920, the duration of probable usefulness of the *Pennant* was very substantially less than its probable physical life. A reasonable allowance for the exhaustion, wear and tear of the *Pennant*, including a reasonable allowance for obsolescence, in each of the taxable years 1918, 1919, and 1920 is $200,000.

OPINION.—From the return, the deficiency notice, the pleadings, or the evidence, it is not clear what deduction the petitioner took for depreciation and obsolescence of the *Pennant* or what the respondent determined in this respect. Apparently, upon all such water transportation facilities a straight 4 percent depreciation rate has heretofore been applied. The deficiency notice indicates that for 1918 the respondent allowed an amortization deduction of $11,549.45 as to the *Pennant*, but what the basis for such allowance was, either in fact or in law, does not appear. It is, however, not in controversy. The petitioner now claims that obsolescence was clearly manifest and that the evidence justifies an allowance in each of the years

now in question sufficient to write off most of the original cost so as to bring the book value down to approximately $360,000 in 1921, when the vessel was hauled up. Evidence was introduced in great detail as to the engineering and economical features of the use and operation of the vessel. Witnesses, both factual and expert, testified, and their testimony was subjected to the most rigid examination. It is clear that the ship was extremely inefficient from the time she was launched, and that the extent of her usefulness was constantly a matter of doubt. It seems unimportant for present purposes that, in the opinion of one marine engineer and designer, she could have been made efficient by repowering at a substantial expenditure; for our inquiry is as to the obsolescence and probable useful life of the ship as she was, a defective and uneconomical property. Whatever the justification for her purchase and for the price paid during the war, it was reasonably clear at the end of 1918, when the war had ceased, that she could not be economically operated much longer. The exact period was perhaps not clearly determinable; but precision is not necessary, *Burnet* v. *Niagara Falls Brewing Co.*, 282 U. S. 648. We think that the evidence fairly demonstrates that a reasonable estimate of forthcoming useful life would not have extended beyond the beginning of 1923. Such an estimate, however, would also have required an estimate of recoverable salvage. As to this, one witness testified that in 1923 the vessel would have brought no more than $115,000. In actual fact, she was sold by the petitioner in 1923 for $25,000.

After a full consideration of all the evidence, we are of opinion and have found as a fact that a reasonable allowance for each of the three years in question for depreciation, including obsolescence, is $200,000.

## VII.

### Proportionate Tax of Pierce Pipe Line Co. of Texas.

Findings.—Pierce Pipe Line Co. of Texas was a member of the affiliated group which filed a consolidated return. It began operations and earnings July 1, 1918. Its operations consisted of and its earnings were derived from the transportation of oil for its affiliated corporation, Pierce Oil.

For 1918 it is stipulated that the net income properly assignable to it was $185,562.73; for 1919 the net income properly assignable to it was $106,948.82; for 1920 the net income properly assignable to it was $71,836.48.

There was during the taxable years no agreement as to an apportionment of the consolidated tax among the affiliated corporations.

OPINION.—After the taxable years, during which Pierce Oil and Pierce Pipe Line were affiliated corporations taxable upon a consolidated return, the affiliation, it is said by counsel, was broken and Pierce Pipe Line is now in the Sinclair group. For this reason Pierce Pipe Line is separately represented, and insists that no deficiency exists as to it. Pierce Oil has, in open court, announced that any deficiency which may be adjudicated as to Pierce Pipe Line has been assumed by it.

Pierce Pipe Line argues that the respondent's determination erroneously attributes to it income which was earned by others prior to its ownership or operation of the pipe line. In this it is correct, for the respondent has assigned to Pierce Pipe Line the income from pipe line operations during all of 1918, although the pipe line was both owned and operated by one or another of the remaining corporations prior to June 25, 1918, when the deeds of conveyance were acknowledged, and was operated by Pierce Oil during the remainder of the month of June. The respondent's determination in this respect appears to grow from a confusion of the accounting for these pipe line operations, the accounts having been continuously kept on Pierce Oil's books during the entire year 1918, irrespective of the particular corporation to which they were technically attributable. But the evidence provides a sufficient analysis of the accounts to permit a proper segregation, and this has resulted in a written stipulation of the parties, conditioned upon the proper date which is to be used as the beginning of Pierce Pipe Line's operating period. As to this, we have determined from a hazy record that July 1, 1918, is the correct date. Certainly the date could not be fixed earlier than June 25 or later than July 1, and as between these two the evidence weighs slightly more heavily on the side of July 1. The stipulation provides, " If the Board shall determine that the Pierce Pipe Line Co. of Texas is liable only with respect to income after June 30, 1918, * * * $185,562.73 was the net income of the Pierce Pipe Line Co. of Texas."

There was, during the taxable years, no agreement as to an apportionment of the consolidated tax among the affiliated corporations. This we have found as a fact, because both parties agreed that there was no express agreement and there is insufficient evidence to support one by implication. While Pierce Oil seems to have paid the entire tax, it is impossible from the evidence to say whether this was because of an agreement, or because of a misconception of the proper method of apportioning the tax, or otherwise explainable. Considering the inept accounting and also the lack of clarity at that time in respect of numerous questions applicable to the tax upon consolidated returns, it is more likely that there was no agreement or understanding

of any sort on the subject of apportionment of tax than that Pierce Oil made such an agreement.

Section 240 (a), Revenue Act of 1918, provides in part:

In any case in which a tax is assessed upon the basis of a consolidated return, the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of any such agreement, then on the basis of the net income properly assignable to each. * * *

Pierce Pipe Line contends that because all of its net income was derived from intercompany transactions, both sides of which are eliminated in the computation of consolidated taxable net income, it must be regarded as having had no net income, and that none is properly assignable to it in the apportionment of consolidated tax. Upon this question it submits an attenuated argument discussing several recent decisions marking the progress of the law on the subject of intercompany transactions. *Woolford Realty Co.* v. *Rose*, 286 U. S. 319 (May 16, 1932); *Post & Sheldon Corporation*, 28 B. T. A. 26 (May 4, 1933); *Commissioner* v. *Post & Sheldon Corporation*, 71 Fed. (2d) 930 (June 16, 1934); *Old Mission Portland Cement Co.* v. *Helvering*, *supra*. According to what, in our opinion, is the last word upon the issue, we hold that the petitioner must bear as its deficiency so much of the consolidated tax as the proportion which its separate income bears to the entire consolidated net income without the elimination of intercompany transactions. The *Woolford* and *Old Mission* cases affected only the determination of consolidated taxable net income for the purpose of computing the consolidated tax, and did not consider the succeeding question of how the consolidated tax should be apportioned. The *Old Mission* case clearly holds that in the process of determining consolidated net income as a factor in the determination of the consolidated tax, intercompany transactions are to be eliminated; but we find nothing in that opinion to indicate that the Court went further and considered the effect of intercompany transactions upon the problem of apportioning the tax among the affiliated corporations. Obviously the consideration of such question was beyond the necessities of the Court's decision, and would involve factors inapplicable to the question before the Court.

The *Post & Sheldon* case, however, expressly discusses the point here involved, although it was not specifically in issue. In that case the Board had decided that, in a case involving the application of a prior net loss, intercompany transactions were required to be eliminated, and in so deciding the Board treated the regulations as universally requiring such elimination both for the purpose of computing current consolidated net income and for the purpose of computing the net income which might be offset by a prior net loss.

The rationale of the Board's opinion was that intercompany items were to be eliminated for all purposes. The Circuit Court of Appeals, however, found a clear distinction between the necessity of such elimination in computing current consolidated taxable net income and the necessity of recognizing the separate net income of each corporation in order that the net loss provision could be confined to each separate taxpayer, as required by the *Woolford* case. In the course of its consideration of this distinction the Court of Appeals was impelled also to consider whether there were other occasions, besides that of net loss, when the recognition of separate net income was important. Such another occasion was found to be the apportionment of the consolidated tax in the absence of agreement, and the court in an express dictum announced the rule that intercompany items could not be eliminated when tax apportionment was the problem. The Board has followed the rule as to net losses in *Autocar Co.*, 31 B. T. A. 361, and *New York, Ontario & Western Railway Co.*, 31 B. T. A. 369; see also *Corco Oil & Refining Co.* v. *Commissioner*, 72 Fed. (2d) 177. We find no reason for applying a different rule to the problem of tax apportionment.

We hold, therefore, that $185,562.73 for 1918, $106,948.82 for 1919, and $71,836.48 for 1920, shall be taken to be the net income properly assignable to the Pierce Pipe Line Co. of Texas, and that these figures should be used for the purpose of the apportionment to that corporation of the consolidated tax ultimately determined.

The net income should be recomputed with proper adjustments for the items covered by the foregoing decision and for the other items covered by stipulation or confessed error. Thereupon the Commissioner should seek the proper comparatives with a view to a correct and final determination of tax and deficiency.

Reviewed by the Board.

*If necessary, the proceeding will be assigned for further hearing under Rule 62.*

ARUNDELL, dissenting: I dissent from the majority holding under point V that the liquidation of Pierce Fordyce gave rise to gain to Pierce Oil. My disagreement does not go to the amount of gain, but to the proposition that the liquidation of a Texas unincorporated joint stock company or association may give rise to gain or loss to the members.

The majority holding is based on the premise that such an association is " to be treated as a corporation for all purposes of the revenue act." This I think is too broad a statement and I do not read the cited case of *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S.

110, as going that far. That case sustained "the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed", namely, at corporate rates, but in the same paragraph of its opinion the Supreme Court said that "Congress cannot convert into a corporation an organization which by the laws of its state is deemed to be a partnership."

Pierce Fordyce, like Burk-Waggoner, was a Texas association. The laws of Texas treat such associations as fundamentally different from corporations but in all essential respects like partnerships. The Supreme Court in the *Burk-Waggoner* case points out:

* * * an association like the plaintiff is a partnership; its shareholders are individually liable for its debts as members of a partnership, *Thompson* v. *Schmitt*, 115 Tex. 53, 274 S. W. 554; *Victor Refining Co.* v. *City National Bank of Commerce*, 115 Tex. 71, 274 S. W. 561; and the association cannot hold real property except through a trustee, *Edwards* v. *Old Settlers' Association*, 106 S. W. 423, 426.

The case of *Thompson* v. *Schmitt*, cited in the *Burk-Waggoner* opinion, holds that:

With certificate holders occupying the relation to the property of its actual and ultimate proprietors, entitled to remedies enforcing their rights as such, we cannot assent to any doctrine that they lack anything in the way of interest in or control over the property which would warrant our refusal to consider them partners.

In *Sergeant* v. *Goldsmith Dry Goods Co.*, 110 Texas, 482; 221 S. W. 259, it is said:

The concern had no being except in those who were members of it. It was not tangible except as they were tangible. As to third persons, they are therefore liable as other principals are liable who deal with third persons through any form of agency. * * * The association was a fiction except as the members stood behind it. * * * They were the association.

If, as these cases indicate, the association has no identity separate and apart from the members and they are the actual proprietors of the property used by the association, I cannot see how gain or loss would arise from either a contribution to the association or a distribution in kind by it. The intangible being called the association does not, like the corporate cloak, insulate the member from liability for the acts of those selected to manage the property or operate the business. Upon distribution in liquidation a member of an association receives property in which he theretofore had a direct interest through his membership in the association; he receives nothing "really different from what he theretofore had." *Weiss* v. *Stearn*, 265 U. S. 242. This is the theory underlying the rule that there is no gain or loss to a partnership upon distribution in kind, which rule has been in effect for many years. See art. 1570, Regulations 45, 62; art. 1603, Regulations 65, 69; art. 604, Regulations 74, 77; art. 113(a)(13)-2, Regulations 86.

Even if Pierce Fordyce itself is "to be treated as a corporation for all purposes of the revenue act", that is only stating the classification in which the Federal Government has placed it for tax purposes, and it does not reach the question of the relation between the association and its members. That relation as shown above is one of partnership, the incidents thereof, which included that of title to property, being determined by state law, and not Federal law. See *Group No. 1 Oil Corporation* v. *Bass*, 283 U. S. 279.

I also disagree with the portion of the opinion under point III which disallows the deduction of the unamortized discount on $4,191,-700 of bonds upon their exchange for preferred stock. It appears that petitioner had outstanding certain bonds which were callable at 105. It advised the holders of the bonds of its intention to call them and made the holders a choice of exchanging the bonds for preferred stock, par for par, or of accepting cash. Some bondholders followed one course and some the other. The record shows that at the time of the exchange the market value of the bonds and preferred stock was each 105. The majority opinion, in reliance on *Chicago, Rock Island & Pacific Railway Co.* v. *Commissioner*, 47 Fed. (2d) 990, and *375 Park Avenue Corporation*, 23 B. T. A. 969, treats the exchange as a capital transaction in which there can be recognized no gain or loss, and consequently holds that the unamortized discount cannot be written off. Later cases hold that upon the substitution of one bond issue for another the unamortized discount applicable to the first issue may be deducted. *San Joaquin Light & Power Corporation* v. *McLaughlin*, 65 Fed. (2d) 677; *Helvering* v. *California Oregon Power Co.*, 75 Fed. (2d) 644; *Helvering* v. *Union Public Service Co.*, 75 Fed. (2d) 723. All of these cases treat successive bond issues as separate transactions, unrelated for accounting purposes. "Logically all unamortized discount and premiums allocable to a bond issue now retired and dead are items of cost in acquiring capital and necessary to a determination of gain or loss upon a retirement of the issue." *Helvering* v. *Union Pacific Service Co.*, *supra*. It requires no argument to support the proposition that there is less relation between stocks and bonds than between successive bond issues. If each bond issue is a complete transaction within itself so separate and distinct that the discount and expenses applicable to it are to be accounted for upon its retirement even though the same kind of liability is substituted for it, there would seem to be more reason for completely closing out the bond issue upon the elimination of the liability and the substitution of shares in the enterprise.

BLACK concurs with this dissent on point V but not on point III. As to point III, he agrees with the majority opinion.

McMAHON concurs with the dissent of Arundell on point III.