CHICAGO & N. W. RY. CO. v. COMMISSIONER OF INTERNAL REVENUE.

COMMISSIONER OF INTERNAL REVENUE v. CHICAGO & N. W. RY. CO.

Nos. 4805, 4814.

Circuit Court of Appeals, Seventh Circuit.

May 29, 1933.

Rehearing Denied Aug. 9, 1933.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. A. Norman, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for Commissioner of Internal Revenue.

R. N. Van Doren and Nelson Trottman, both of Chicago, Ill., for Chicago & N. W. Ry. Co.

Before ALSCHULER and SPARKS, Circuit Judges, and FITZHENRY, District Judge.

FITZHENRY, District Judge.

The Chicago & North Western Railway Company, petitioner, appeals from the order of the United States Board of Tax Appeals in its case against the Commissioner of Internal Revenue. The Commissioner of Internal Revenue makes his cross-appeal from the order complained of in the original appeal. The chief questions involved in both appeals have to do with the undermaintenance during federal control of the taxpayer's property and the compromise settlements between the taxpayer and the Director General.

The property of the taxpayer was taken over by the United States government December 28, 1917, and for accounting purposes as of December 31, 1917, under and by virtue of the President's Proclamation of December 26, 1917. It was operated until and including February 29, 1920, when it was returned to the taxpayer. It was under the management of the United States Railroad Administration, at the head of which was the Director General of Railroads.

Under the Federal Control Act March 21, 1918 (40 Stat. 451), the President was authorized to enter into agreements, with the several carriers, with reference to the just compensation to be paid them for the use of their several properties during federal control.

Upon authority of the act the Director General and the taxpayer entered into the "Standard Contract," which had been worked out and accepted by most of the railroad companies. This contract required, during federal control, that the Director General should annually, as nearly as practicable, expend either in payments for labor and material, or by payments into funds, such sums for maintenance, repairs, renewals, retirement, and depreciation as might be requisite in order that the property may be returned in substantially as good repair and in substantially as complete equipment as on January 1, 1918. It also provided that the annual expenditures and charges, during federal control of such property, and the fair distribution thereof, or the payment into funds of an amount equal in the aggregate to the average annual expenditures and charges therefor during the stipulated test period (less the cost of fire insurance), should be taken as a full compliance with the foregoing obligations, and in comparing the amounts expended during federal control with amounts expended during the test period, due allowance should be made for any difference that might exist between the cost of labor and materials and between the amount of property taken over and the average of the test period, and for any difference in use substantial enough, in the opinion of the Commission, to be considered, so that the result would be as nearly as practicable the

same relative amount, character, and durability of physical reparation.

At the end of federal control (February 29, 1920), the Director General returned to the taxpayer a railroad which was not in substantially as good repair and with as complete equipment as when taken over.

The amount of undermaintenance of the taxpayer's property became a proper charge against the Director General at the conclusion of federal control, and all that remained to be done was to ascertain its extent according to the standards agreed upon in the contract between the parties, from January 1, 1918, to February 29, 1920, inclusive.

From accounting circulars sent to the appropriate officers and employees of the property, the Director General ascertained that the taxpayer's railroad, ways, and structures had been undermaintained in the sum of $4,585,865, and the equipment overmaintained in the sum of $3,525,747.

The taxpayer claimed, under a proper construction of the contract and provisions for ascertaining the amounts of the several items, there was due the railroad approximately $33,000,000, while the Director General contended originally the taxpayer owed him $1,774,495.04. Later, there were some adjustments made in the division of liquidation claims of the Railroad Administration and the original figures of the Director General were changed, and the total amount of undermaintenance was fixed at $8,191,905.37.

There were many conferences with reference to the amount due the taxpayer, which continued until late in the summer of 1921. Finally the Director General offered to pay the taxpayer a lump sum of $6,500,000 in full of all claims, which was accepted. The claim of the Director General for overmaintenance of equipment and many claims of the taxpayer were eliminated, and upon the payment in cash the taxpayer's release was taken, which, among other things, provided:

"The purpose and effect of this instrument is to evidence the complete and final settlement of all demands of every kind and character as between the parties hereto growing out of Federal control of railroads. * * * "

A "breakdown" of this settlement made by the Director General indicates that, giving effect to various debits and credits in the mutual account between the parties, the allowance included in the settlement for undermaintenance of way and structures was $5,000,000, and for equipment, $3,191,905.37.

The Commissioner of Internal Revenue, in an audit made some time after the date of settlement, eliminated this sum from deductions for operating expenses for the year 1920 in the taxpayer's income tax return, upon the theory that the taxpayer had been reimbursed for undermaintenance to that extent. The effect of this action was to reduce deductions for operating expenses by that amount, being the amount that was taken care of by the payment of the cash provided for in the settlement, $6,500,000.

The Board of Tax Appeals reduced the amount of the disallowance from $8,191,905.-37 to $3,263,523. It held that 1920 maintenance expenses exceeded normal by no more than this sum and held to that extent the Commissioner must be sustained. Both sides have appealed from the ruling.

The material questions involve a determination as to whether or not the payment made by the Director General to the taxpayer in settlement of its claims incident to federal control was a payment for damages to property, or whether it was income; and, also, whether or not, if income, it accrued to the taxpayer in 1920 or the year it was paid, 1921; whether the allowance made by the Director General in final settlement of 1921 of taxpayer's claim for property damaged on account of undermaintenance should be added to the net income of 1920, either under the theory (1) that the amount so allowed in settlement constitutes a reimbursement of the taxpayer's 1920 operating expenses, or (2) upon the theory that it constitutes 1920 income without any consideration as an off-set of the loss occasioned by the damage to property in compromise settlement for which the so-called undermaintenance allowance was made; whether in the event that the Board's theory is correct, namely, that operating expenses are to be reduced and net income correspondingly increased by the amount that maintenance expenses for 1920 exceeded the assumed normal expenditures measured by a comparison with the test period, the amount of such excess has been correctly computed.

It was and is the contention of the Commissioner that the entire amount of undermaintenance allowance reflected in the final settlement made in 1921, $8,191,905.37, should in one form or another be accounted for in the taxpayer's 1920 income tax return. The taxpayer asserts that the Board incorrectly sustained this contention to the extent of $3,263,520; while the Commissioner asserts that the Board erred in reducing to this last-

named sum the amount which he had added to the net income.

There is a substantial agreement between the parties as to several very important questions of fàct. It is charged and not denied and the Board of Tax Appeals found, that between January 1, 1918, and March 1, 1920, there was a substantial failure to maintain the ways, structures, and equipment of the taxpayer's railroad property, so that when the property was returned to the taxpayer, on the latter date, it was in a very greatly depreciated condition, due to undermaintenance during the period of federal control. The ballasting of the ways had been neglected, drain ditches had been permitted to become obstructed and full of weeds, the rails were bent and otherwise unserviceable, cinder ballast had been installed where there should have been crushed stone, the shoulders had been permitted to slough off, replacement of ties had not been kept up, inferior ties had been installed, and the property was in bad condition. The only serious question that remained to be settled was the extent of the undermaintenance, to be calculated according to the standards provided in the Federal Control Act and the contract between the parties.

When the taxpayer's return for 1920 came in, it did not disclose the receipt of the sum of $6,500,000 from the Director General, paid in settlement for undermaintenance, which aggregated the sum found by the Director General, $8,191,905.37. Upon checking up the return, the Commissioner ascertained the amount of undermaintenance disposed of in that settlement according to the (undisclosed) records of the Director General, and either added that amount to the gross income or deducted it from the current maintenance for the year 1920.

The taxpayer claimed that the actual amount of the undermaintenance during the period of federal control was in the aggregate $33,000,000.

The taxpayer's appeal is very largely predicated upon the claim that, by reason of the undermaintenance of its property during federal control, its property not only sustained loss incident to undermaintenance, but, in addition to the amount necessary to restore the property to its normal condition, it had suffered a very serious injury and damage.

The material question in this case is, whether or not the settlement made for undermaintenance and the amount paid to the taxpayer by the Director General of Railroads was income, within the meaning of the law, which should be accounted for as income in the taxpayer's return for the year 1920.

The railroad was taken over pursuant to the proclamation of the President in the emergency of war; later, March 21, 1918, the Federal Control Act authorized the President to enter into agreements with the several carriers with reference to the just compensation to be paid them for the use of their several properties during federal control. A contract was entered into with the taxpayer, and adequate and appropriate provision for the maintenance, repair, renewals, and depreciation of the property was made, or the creation of reserves or reserve funds necessary in connection therewith was provided for. Provision was made for accounting and adjustments, and charges and payments, both during and at the end of federal control. It was clearly the purpose to make provision for the necessary care of the property, so that "the property of each carrier may be returned to it in substantially as good repair and in substantially as complete equipment as it was in at the beginning of Federal control." The act further made provision that in making such accounting and adjustments "due consideration shall be given to the amounts expended or reserved by each carrier for maintenance, repairs, renewals, and depreciation during the three years ended June thirtieth, nineteen hundred and seventeen, to the condition of the property at the beginning and at the end of Federal control and to any other pertinent facts and circumstances." Federal Control Act, § 1 (40 Stat. 451).

The contract between the Director General and the taxpayer contained this provision:

"Section 5 (a) During the period of Federal control the Director General shall, annually, as nearly as practicable, expend and charge to railway operating expenses, either in payment for labor and materials, or, by payments into funds, such sums for the maintenance, repair, renewal, retirement, and depreciation of the property described in paragraph (a) of Section 2 hereof as may be requisite in order that such property may be returned to the Companies at the end of Federal control in substantially as good repair and in substantially as complete equipment as it was on January 1, 1918. * * *

"(c) In comparing the amounts expended and charged under the provisions of paragraphs (a) and (b) of this section with the amounts expended and charged during the test period, due allowance shall be made for any difference that may exist between the cost

of labor and materials and between the amount of property taken over and the average for the test period, and, as to paragraph (a) for any difference in use between that of the test period and during Federal control which in the opinion of the Commission is substantial enough to be considered, so that the result shall be, as nearly as practicable, the same relative amount, character and durability of physical reparation."

It will be observed that both under Federal Control Act (section 1, Act approved March 21, 1918) and the express provisions of the contract (dated September 10, 1918) it was provided that one of two things should be done:

(1) That the Director General should "expend and charge to railway operating expenses, either in payments for labor and materials" for the annual maintenance of the property as described in paragraph (a) of section 2, "as may be requisite in order that such property may be returned to the Companies at the end of Federal control in substantially as good repair and in substantially as complete equipment as it was on January 1, 1918"; or (2) the Director General was required to make payments into funds of such sums as would accomplish the same purpose.

It stands admitted in this record that the Director General complied with neither of these requirements. He neither expended the amount required for annual maintenance, nor did he create and pay into funds the amount necessary to meet the requirements of current maintenance, but simply operated the property as economically as he could, regardless of the full extent of the required maintenance and of the consequences to the property itself, and permitted the funds which otherwise should have been expended and charged to the railway operating expenses to accumulate in his hands. It was the aggregate of these accumulations which represented the extent of the undermaintenance of the Director General of Railroads at the time he turned the property back to the taxpayer.

The Director General admits the undermaintenance and does not claim he created funds and paid into them the amounts which were not expended in current maintenance, as required by the contract. There was a clear breach of the contract so far as the Director General was concerned, his liability therefor was admitted and is one of the chief reasons relied upon to bring this case within the authorities which provide that where the liability becomes absolutely fixed during a particular year, but the final account is not stated until a later year, a recovery is an item to be disposed of in the taxpayer's return in the year in which the rights of the parties or their liabilities accrued.

Briefly, when the government took over the taxpayer's property it agreed, at the conclusion of federal control, to restore to the railroad all of its property received as of January 1, 1918, in amount, or its money's worth; that is, it agreed to turn back the property, maintained according to the contract requirements for annual or current maintenance, or the money which should have been and was not expended therefor.

The contract expressly provided that if the required amount of annual maintenance was done, with the funds which the Director General was required "to expend and charge to railway operating expenses" or, if not expended and charged, they were to be paid into reserve funds for the ultimate benefit of the railroad, such obedience to the contract "shall be taken as a full compliance with the foregoing covenant," and, conversely, the effect of the covenant is that nothing short of the expenditures required under section 5 (a), or a performance of the alternative provision, shall be a full compliance with the contract.

The Director General of Railroads, in the management of the taxpayer's property, elected not to "expend and charge to railway operating expenses" the contractual amount for maintenance. Because he did not do so, it is now contended by the Commissioner that any overmaintenance after March 1, 1920, made necessary by the undermaintenance of the Director General during federal control must be charged to the gross income, or deducted from the maintenance expenses of the taxpayer.

Nobody would seriously contend that the taxpayer should be taxed for any of the Director General's operating expenses before the termination of federal control, and no good reason is assigned or can be assigned as to why it should be taxed for the same railway operating expenses after federal control.

The Board of Tax Appeals erred in finding that because, according to its line of reasoning, the taxpayer expended in 1920, $3,263,520 more than the amount of normal maintenance would require, that that amount should be deducted from its operating expenses for that year and added to the gross income. If it is true that the taxpayer did expend that amount in 1920 in excess of the re-

quirements of normal maintenance, it was simply doing that much work for the Director General which had not been done prior to turning the properties back on March 1, 1920. In such circumstances it would be most inequitable and unjust to treat any such sum as income.

The taxpayer's capital assets, among other things, consisted of its railway property maintained to the average amount to which it was maintained and operated during the test period from July 1, 1914, to June 30, 1917.

In Bowers, Collector, v. Kerbaugh-Empire Co., 271 U. S. 170, 46 S. Ct. 449, 451, 70 L. Ed. 886, the United States Supreme Court said: "After full consideration, this court declared that income may be defined as gain derived from capital, from labor, or from both combined, including profit gained through sale or conversion of capital."

Citing Stratton's Independence v. Howbert, 231 U. S. 399, 34 S. Ct. 136, 58 L. Ed. 285; Doyle v. Mitchell Bros., 247 U. S. 179, 38 S. Ct. 467, 62 L. Ed. 1054; Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; and further said (page 174 of 271 U. S., 46 S. Ct. 449, 451, 70 L. Ed. 886):

"And that definition has been adhered to and applied repeatedly. * * * In determining what constitutes income substance rather than form is to be given controlling weight. Eisner v. Macomber, supra."

The amount of undermaintenance due the taxpayer on March 1, 1920, was not income in any sense under the foregoing definition. In making the settlement with the taxpayer it was considered by the Director General that the sum of $8,191,905.37 was due the taxpayer for undermaintenance during the period of federal control. In making the cash payment to the taxpayer the Director General was simply paying moneys to the taxpayer which should have been placed in a fund and delivered with the rails, roadbed, and cars at the end of federal control. The sum paid was not the result of any corporate transaction, and it is fair to presume from the record that the taxpayer received much less than it was entitled to, sustaining a distinct loss.

In a very recent case, Commissioner, etc., v. Norfolk Southern R. Co., 63 F.(2d) 304, 306, the Court of Appeals for the Fourth Circuit had substantially the same question under consideration, and among other things said: "We think the true nature of the allowance made to the taxpayer for 'undermaintenance' was a reserve for deferred maintenance, due to waste or impairment of capital; and was not a gain, profit, or income from property in any proper sense, either legal or economic. The proper analogy here is not that of the profit and loss account of a contracting business, but more nearly that springing from the well-known relationship of landlord and tenant, where the tenant agrees to keep the property in repair. In such a case a cash sum recovered from the tenant to measure the extent of the breach of his promise to repair is a restoration of capital and not income. Certainly this is true in the economic sense, and the income tax law treats it no differently. Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570."

In the view we take of the character of the proceeds of the settlement of September 18, 1921, between the taxpayer and the Director General, that is, that the payment to the taxpayer was merely the restitution of capital assets due to undermaintenance during the period of federal control, and not income, within the meaning of the Revenue Acts of 1918 and 1921 (40 Stat. 1057; 42 Stat. 227), and therefore not taxable, it becomes unnecessary to decide the other questions presented.

For the reasons given the holding of the Board of Tax Appeals, that $3,263,523 of the settlement with the Director General should be deducted from the operating expenses of the taxpayer in its return for the year 1920, or charged to the gross income, is reversed, and the cause remanded with directions to eliminate from the income tax return the entire proceeds of the settlement in taxpayer's return for the year 1920.