ALBERT J. AND SYLVIA ADES, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79388–79391. Filed July 27, 1962.

*Marvin S. Machson, Esq.*, for the petitioners.
*Dean P. Kimball, Esq.*, for the respondent.

### OPINION.

FORRESTER, *Judge:* Respondent has determined deficiencies in income tax and additions thereto as follows:

| Docket No. | Year | Deficiency | Addition to tax, sec. 6654, I.R.C. 1954 |
|---|---|---|---|
| 79388 | 1954 | $2,953.82 | |
|  | 1955 | 2,049.53 | |
| 79389 | 1954 | 1,180.10 | |
|  | 1955 | 859.88 | |
| 79390 | 1954 | 1,375.51 | |
|  | 1955 | 1,127.22 | |
| 79391 | 1953 | 21,054.52 | |
|  | 1954 | 44,480.72 | |
|  | 1955 | 65,292.24 | $281.45 |

---

[1] There was no limitation as to the price at which it could sell the certificates.

[1] Proceedings of the following petitioners are consolidated herewith: Alan and Ruth Ades, Docket No. 79389; Robert Ades, Docket No. 79390; and Joseph and Rachel Ades, Docket No. 79391.

Certain adjustments have been conceded by all petitioners, and petitioners in Docket No. 79391 have abandoned the question of the addition to tax for 1955.

The sole issue remaining for consideration is whether petitioners may deduct the premiums paid for certain convertible and callable bonds during the year in which they were converted into the stock of the issuing corporation.

All of the facts have been stipulated and are so found.

All petitioners are individuals who filed their income tax returns for the years involved as follows:

| Docket No. | Taxpayer | Year | Place of filing |
|---|---|---|---|
| 79388 | Albert J. and Sylvia Ades (husband and wife) | 1954<br>1955 | Brooklyn, N.Y.<br>Upper Manhattan, N.Y. |
| 79389 | Alan and Ruth Ades (husband and wife) | 1954<br>1955 | Boston, Mass.<br>Boston, Mass. |
| 79390 | Robert Ades | 1954<br>1955 | Brooklyn, N.Y.<br>Brooklyn, N.Y. |
| 79391 | Joseph and Rachel Ades (husband and wife) | 1953<br>1954<br>1955 | Upper Manhattan, N.Y.<br>Upper Manhattan, N.Y.<br>Upper Manhattan, N.Y. |

Some of the petitioners herein (joint returns were filed by petitioners in Docket Nos. 79388, 79389, and 79391) owned interests in a partnership known as Bon Marche Co. Their shares in profits and losses of said partnership during the taxable years herein involved were as follows:

| Partner | Docket No. | Percentage of profit or loss |
|---|---|---|
| Albert J. Ades | 79388 | 40 |
| Alan Ades | 79389 | 25 |
| Robert Ades | 79390 | 25 |
| Rachel Ades | 79391 | 10 |

Bon Marche Co. filed income tax returns for its fiscal years ending July 31, 1954, and July 31, 1955, with the district director of internal revenue, Upper Manhattan, New York.

The partnership purchased certain convertible 3¾-percent debentures of American Telephone & Telegraph Company, dated December 10, 1953, and due December 10, 1965. During its fiscal years ending on July 31, 1954, and July 31, 1955, it converted these debentures to stock as shown in the following table:

BON MARCHE CO.—1954 AND 1955

AMERICAN TEL. AND TEL. CONVERTIBLE DEBENTURES (3¾%) DUE 1965

| Date of purchase | Date of conversion | Face amount | Total cost | Total bond premium after eliminating portion due to stock convertibility feature |
|---|---|---|---|---|
| Year ended July 31, 1954 | | | | |
| 11/ 9/53 | 2/18/54 | $50,000 | $58,687.50 | $3,500.00 |
| 11/ 9/53 | 4/ 6/54 | 50,000 | 58,187.50 | 3,500.00 |
| 2/26/54 | 3/10/54 | 50,000 | 63,300.00 | 5,000.00 |
| 3/ 4/54 | 4/ 6/54 | 20,000 | 25,287.50 | 2,100.00 |
| 6/10/54 | 7/27/54 | 40,000 | 52,510.00 | 3,900.00 |
| Totals | | 210,000 | 257,972.50 | 18,000.00 |
| Year ended July 31, 1955 | | | | |
| 6/10/54 | 12/ 3/54 | $30,000 | $39,660.00 | $2,925.00 |
| 6/23/54 | 12/ 3/54 | 10,000 | 13,107.50 | 975.00 |
| 6/ 1/54 | 2/ 8/55 | 9,000 | 11,819.25 | 877.50 |
| 6/ 8/54 | 2/ 8/55 | 1,000 | 1,319.50 | 97.50 |
| 6/ 9/54 | 2/ 8/55 | 10,000 | 13,132.50 | 975.00 |
| 8/ 2/54 | 12/ 3/54 | 40,000 | 55,430.00 | 3,850.00 |
| Totals | | 100,000 | 134,468.75 | 9,700.00 |

Rachel and Joseph individually purchased and converted certain other debentures as follows:

TABLE OF 1953 CONVERSIONS

| Date of purchase | American Tel. and Tel. Convertible Debentures (3½%) Due 1964 | | | |
|---|---|---|---|---|
| | Date of conversion | Face amount | Total cost | Total bond premium after eliminating portion due to stock convertibility feature |
| 7/15/52 | 2/ 2/53 | $1,000 | $1,154.41 | $60.00 |
| 12/30/52 | 2/ 2/53 | 1,000 | 1,230.00 | 58.75 |
| 1/16/53 | 2/ 2/53 | 8,000 | 9,840.00 | 420.00 |
| 1/26/53 | 2/ 4/53 | 10,000 | 12,275.00 | 525.00 |
| 2/ 6/53 | 2/20/53 | 10,000 | 12,275.00 | 475.00 |
| 2/ 6/53 | 2/20/53 | 10,000 | 12,275.00 | 475.00 |
| 2/ 9/53 | 2/20/53 | 3,000 | 3,675.00 | 142.50 |
| 2/ 9/53 | 2/20/53 | 3,000 | 3,682.50 | 142.50 |
| 2/10/53 | 2/20/53 | 4,000 | 4,910.00 | 190.00 |
| 2/11/53 | 2/20/53 | 10,000 | 12,250.00 | 475.00 |
| 2/ 2/53 | 3/ 4/53 | 10,000 | 12,250.00 | 475.00 |
| 2/ 2/53 | 3/ 4/53 | 10,000 | 12,262.50 | 475.00 |
| 2/11/53 | 3/ 4/53 | 3,000 | 3,671.25 | 142.50 |
| 2/16/53 | 3/ 4/53 | 7,000 | 8,566.25 | 332.50 |
| 2/17/53 | 3/ 4/53 | 10,000 | 12,200.00 | 475.00 |
| 2/ 2/53 | 3/ 9/53 | 10,000 | 12,275.00 | 475.00 |
| 3/26/53 | 4/ 1/53 | 20,000 | 24,550.00 | 850.00 |
| 3/27/53 | 8/24/53 | 10,000 | 12,200.00 | 425.00 |
| 3/30/53 | 8/24/53 | 10,000 | 12,125.00 | 425.00 |
| 3/30/53 | 8/24/53 | 10,000 | 12,175.00 | 425.00 |
| 3/30/53 | 8/24/53 | 10,000 | 12,150.00 | 425.00 |
| 3/30/53 | 8/24/53 | 10,000 | 12,100.00 | 425.00 |
| 3/31/53 | 8/24/53 | 10,000 | 12,075.00 | 425.00 |
| 3/31/53 | 8/24/53 | 10,000 | 12,050.00 | 425.00 |
| 3/31/53 | 8/24/53 | 10,000 | 12,025.00 | 425.00 |
| 4/ 1/53 | 8/24/53 | 10,000 | 11,950.00 | 325.00 |
| 4/ 6/53 | 8/24/53 | 10,000 | 11,925.00 | 325.00 |
| 4/22/53 | 8/24/53 | 10,000 | 11,850.00 | 325.00 |
| 4/22/53 | 8/24/53 | 10,000 | 11,825.00 | 325.00 |
| 6/ 8/53 | 8/28/53 | 100,000 | 117,750.00 | 2,750.00 |
| 6/ 9/53 | 9/ 2/53 | 90,000 | 105,862.50 | 2,475.00 |
| 6/ 9/53 | 9/ 4/53 | 10,000 | 11,762.50 | 275.00 |
| 6/ 9/53 | 9/ 4/53 | 80,000 | 93,200.00 | 2,200.00 |
| 6/ 9/53 | 9/ 4/53 | 60,000 | 69,900.00 | 1,650.00 |
| 6/ 9/53 | 9/ 9/53 | 60,000 | 69,900.00 | 1,650.00 |
| 9/ 3/53 | 10/ 9/53 | 100,000 | 116,625.00 | 3,625.00 |
| 9/ 3/53 | 10/15/53 | 110,000 | 128,287.50 | 3,987.50 |
| 9/ 3/53 | 10/21/53 | 100,000 | 116,625.00 | 3,625.00 |
| Totals | | 960,000 | 1,133,704.41 | 83,126.25 |

TABLE OF 1954 CONVERSIONS

| Date of purchase | American Tel. and Tel. Convertible Debentures (3¾%) Due 1965 | | | |
|---|---|---|---|---|
| 12/ 3/53 | 2/ 9/54 | $74,000 | $85,807.57 | $5,550.00 |
| 12/11/53 | 2/ 9/54 | 120,000 | 142,200.00 | 9,000.00 |
| 2/ 2/54 | 2/ 9/54 | 1,000 | 1,221.25 | 100.00 |
| 2/ 2/54 | 2/ 9/54 | 5,000 | 6,100.00 | 500.00 |
| 12/11/53 | 2/19/54 | 190,000 | 225,150.00 | 14,250.00 |
| 12/28/53 | 2/19/54 | 30,000 | 35,662.50 | 2,250.00 |
| 12/28/53 | 2/25/54 | 180,000 | 213,975.00 | 13,500.00 |
| 9/ 9/54 | 9/27/54 | 200,000 | 268,000.00 | 19,250.00 |
| 9/ 9/54 | 10/ 1/54 | 200,000 | 268,000.00 | 19,250.00 |
| 9/ 9/54 | 10/ 6/54 | 200,000 | 268,000.00 | 19,250.00 |
| Totals | | 1,200,000 | 1,514,116.32 | 102,900.00 |

TABLE OF 1955 CONVERSIONS

| Date of purchase | Date of conversion | Face amount | Total cost | Total bond premium after eliminating portion due to stock convertibility feature |
|---|---|---|---|---|
| | AMERICAN TEL. AND TEL. CONVERTIBLE DEBENTURES (3¾%) DUE 1965 | | | |
| 1/10/55 | 2/ 9/55 | $50,000 | $68,875.00 | $4,687.50 |
| 1/10/55 | 2/ 9/55 | 50,000 | 68,937.50 | 4,687.50 |
| 4/ 1/55 | 4/15/55 | 200,000 | 287,500.00 | 16,500.00 |
| 4/21/55 | 5/11/55 | 200,000 | 298,750.00 | 16,500.00 |
| 5/20/55 | 5/31/55 | 100,000 | 146,250.00 | 7,625.00 |
| 5/20/55 | 5/31/55 | 100,000 | 146,250.00 | 7,625.00 |
| 8/10/55 | 8/18/55 | 100,000 | 146,250.00 | 5,625.00 |
| Totals | | 800,000 | 1,153,812.50 | 63,250.00 |
| | AMERICAN TEL. AND TEL. CONVERTIBLE DEBENTURES (3⅞%) DUE 1967 | | | |
| 11/25/55 | 12/13/55 | 100,000 | 130,625.00 | 7,625.00 |
| 11/25/55 | 12/13/55 | 100,000 | 130,500.00 | 7,625.00 |
| 11/ 3/55 | 12/15/55 | 100,000 | 128,500.00 | 7,625.00 |
| 11/10/55 | 12/15/55 | 100,000 | 130,250.00 | 7,625.00 |
| 10/17/55 | 12/16/55 | 100,000 | 124,375.00 | 8,750.00 |
| 11/17/55 | 12/20/55 | 100,000 | 131,250.00 | 7,625.00 |
| 11/18/55 | 12/20/55 | 10,000 | 12,975.00 | 762.50 |
| 11/18/55 | 12/20/55 | 90,000 | 116,887.50 | 6,862.50 |
| 12/19/55 | 12/28/55 | 50,000 | 65,500.00 | 3,812.50 |
| 12/19/55 | 12/28/55 | 30,000 | 39,262.50 | 2,287.50 |
| 12/20/55 | 12/28/55 | 20,000 | 26,200.00 | 1,525.00 |
| 12/21/55 | 12/28/55 | 50,000 | 65,500.00 | 3,812.50 |
| Totals | | 850,000 | 1,101,825.00 | 65,937.50 |
| | SOUTHERN NATURAL GAS CO. CONVERTIBLE DEBENTURES (4½%) DUE 1973 | | | |
| 6/10/54 | 2/15/55 | 15,000 | 16,950.00 | 1,312.50 |
| 6/10/54 | 2/15/55 | 15,000 | 16,968.75 | 1,312.50 |
| 6/10/54 | 2/15/55 | 20,000 | 22,650.00 | 1,750.00 |
| 2/ 4/55 | 2/14/55 | 50,000 | 59,375.00 | 4,250.00 |
| Totals | | 100,000 | 115,943.75 | 8,625.00 |

The earliest call dates and conditions of convertibility of the various debentures purchased are as follows:

| Description | Date of issuance | Earliest call date | Basis of exchange |
|---|---|---|---|
| Amer. Tel. & Tel. 3⅞s 1967 | 10/13/55 | 10/13/57 | $100 face value of debenture plus $48=1 share. |
| Amer. Tel. & Tel. 3⅛s 1964 | 7/31/52 | 7/31/54 | $100 face value of debenture plus $36=1 share. |
| Amer. Tel. & Tel. 3¾s 1965 | 12/10/53 | 12/1/55 | $100 face value of debenture plus $36=1 share. |
| So. Natl. Gas 4½s 1973 | 6/ 1/53 | On at least 40 days' notice at any time. | $100 face value of debenture=3.57 shares.[2] |

All the bonds carried interest coupons. The amounts payable in case the bonds were called before maturity varied downward from an amount in excess of face value toward face value as maturity drew nearer.

Petitioners Joseph and Rachel Ades deducted the entire bond

---

[2] The exchange basis varied according to time and was on a 3.57 basis for the period of the actual exchange herein.

premium (exclusive of that portion attributable to the stock convertibility feature) in their income tax returns for the years in which their various bonds were converted, which deduction was disallowed by respondent.

The partnership similarly deducted an amount in its returns for its fiscal years ended July 31, 1954, and July 31, 1955, representing the total premium on the debentures it had converted during those periods (exclusive of that portion of the premium attributable to the stock convertibility feature). Respondent also disallowed these deductions and increased income to the partners accordingly.

A portion of the stock acquired by the partnership and of that acquired directly by Joseph and Rachel Ades was sold during one or more of the taxable years. No sales of such stock were made by the partnership in its fiscal year ended July 31, 1955.

In computing the capital gains realized by Joseph and Rachel Ades upon the sale of the stock acquired upon conversion of their debentures and in computing the partnership capital gains on the sale of stock acquired by converting its debentures, respondent reduced the gains by increasing the basis for such stock sold by the portions of the disallowed deduction for amortization of bond premium attributable to such stock.

All of the conversions were made pursuant to the conditions of the debentures, and no gain or loss was recognized upon the conversion of the debentures into stock. Both the debentures and the stock were held by all petitioners as investments.

Petitioners rely on section 125 of the Internal Revenue Code of 1939 and section 171 of the Internal Revenue Code of 1954 as permitting the questioned deductions.[3] They rely on the legislative history of the amortizable bond premium statute and upon a claimed economic

---

[3] SEC. 125. AMORTIZABLE BOND PREMIUM.

(a) GENERAL RULE.—In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond for any taxable year beginning after December 31, 1941 :

(1) INTEREST WHOLLY OR PARTIALLY TAXABLE.—In the case of a bond (other than a bond the interest on which is excludible from gross income), the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction.

\* \* \* \* \* \* \*

(b) AMORTIZABLE BOND PREMIUM.—

(1) AMOUNT OF BOND PREMIUM.—For the purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined with reference to the amount of the basis (for determining loss on sale or exchange) of such bond, and with reference to the amount payable on maturity or on earlier call date, with adjustments proper to reflect unamortized bond premium with respect to the bond, for the period prior to the date as of which subsection (a) becomes applicable with respect to the taxpayer with respect to such bond. In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond.

(2) AMOUNT AMORTIZABLE.—The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year.

[Section 171(a)(1), (b)(1)(A), and (b)(1)(C), I.R.C. 1954, are substantially similar except as discussed *infra*.]

relationship between call and conversion, although admitting that there is no specific statutory authority for their deductions.

Prior to 1942 no deduction was allowable in respect to bond premium, and a bondholder treated the premium as part of the basis for the bond in computing capital gain or loss upon disposition of the bond. See H. Rept. No. 2333, 77th Cong., 2d Sess., p. 47 (1942); *Commissioner* v. *Korell*, 339 U.S. 619 (1950). Except for tax-exempt bonds, interest at the coupon rate constituted taxable income, although since the bonds were purchased at a premium the actual yield was less than the coupon rate. Therefore that part of the coupon rate representing a return of capital was taxed as ordinary income while upon eventual disposition it was compensated for only by a capital loss. Tax-exempts, when eventually disposed of, allowed recovery of the premium as a capital loss, while not taxing the interest in the meantime.

To cure these inequities and to conform to sound accounting practices, Congress in 1942 enacted section 125. H. Rept. No. 2333, *supra* at 78-81; S. Rept. No. 1683, 77th Cong., 2d Sess., pp. 92-95 (1942); *Hanover Bank* v. *Commissioner*, 369 U.S. 672 (1962). Thereafter a deduction was given equivalent to that portion of the coupon rate reflecting the return of the premium.

However, in *Commissioner* v. *Korell*, *supra*, and *Shoong* v. *Commissioner*, 339 U.S. 974 (1950), section 125 was held to have authorized the deduction of that part of a bond premium attributable to the stock convertibility feature. These decisions caused Congress to add a sentence [4] to the statute to close this loophole, since the deduction was only designed to offset that part of the premium paid for the high coupon rate. See H. Rept. No. 2319, 81st Cong., 2d Sess., p. 47 (1950). No part of the deductions before us is referable to the conversion features of the debentures.

Until 1954 the deduction for any taxable year was limited to the premium allocable to such year. Such allocation was spread over the period from acquisition to maturity or to an earlier call date. In 1954 Congress added section 171(b)(1)(B) [5] to require amortization to maturity of certain bonds callable within 3 years of issue. However, holders of such bonds were allowed to deduct as an ordinary loss

---

[4] "In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond." (Added by sec. 217, Revenue Act of 1950.)

[5] SEC. 171. AMORTIZABLE BOND PREMIUM.

(b) AMORTIZABLE BOND PREMIUM.—

(1) AMOUNT OF BOND PREMIUM.—For purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined—

    \*        \*        \*        \*        \*        \*        \*

(B) with reference to the amount payable on maturity or on earlier call date (but in the case of bonds described in subsection (c)(1)(B) issued after January 22, 1951, and acquired after January 22, 1954, only if such earlier call date is a date more than 3 years after the date of such issue), \* \* \*

[All further references are to the 1954 Code.]

their unamortized bond premium in the year of actual call under section 171(b)(2).[6]  S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 210–211 (1954). It is this provision on which petitioners rely.[7]

Petitioners seek to equate "conversion" with "redemption" as used in section 171(b)(2). Since redemption is there used as the amount paid upon "call," petitioners also argue that a conversion is tantamount to a call exercisable at the option of the holder.

In *Deputy* v. *DuPont*, 308 U.S. 488, 493 (1940), the Supreme Court stated:

But allowance of deductions from gross income does not turn on general equitable considerations. It "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435, 440, * * *. And when it comes to construction of the statutory provision under which the deduction is sought, the general rule that "popular or received import of words furnishes the general rule for the interpretation of public laws," * * * [citation omitted] is applicable.

Since deductions from income are a matter of legislative grace, it is incumbent on a taxpayer to clearly bring himself within the purview of a recognized deduction category. *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934).

Congress, in enacting section 171(b)(2), selected the words "call," "called," and "redemption." Black's Law Dictionary (4th ed. 1951) defines a "call" as (p. 256): "demand for payment * * * especially by formal notice." "Redemption" is defined as (p. 1443): "A repurchase; a buying back. * * * Repurchase of notes, bills, or other evidences of debt, * * * by paying their value in coin to their holders."

We cannot agree that petitioners' conversions constituted "calls" or "redemptions." Each debenture gave petitioners the right to convert it into stock at a fixed price. The premium paid for this right cannot be deducted under any circumstances, as discussed *supra*. Petitioners also had the right to receive at least face value for their debentures and might even receive one of the higher call prices if the issuer called any of the debentures.

[6] SEC. 171. AMORTIZABLE BOND PREMIUM.
   (b) AMORTIZABLE BOND PREMIUM.—
    *      *      *      *      *      *      *
    (2) AMOUNT AMORTIZABLE.—The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year. In the case of a bond described in subsection (c)(1)(B) issued after January 22, 1951, and acquired after January 22, 1954, which has a *call* date not more than 3 years after the date of such issue, the amount of bond premium attributable to the taxable year in which the bond is *called* shall include an amount equal to the excess of the amount of the adjusted basis (for determining loss on sale or exchange) of such bond as of the beginning of the taxable year over the amount received on *redemption* of the bond or (if greater) the amount payable on maturity.   [Emphasis supplied.]

[7] Even though respondent does not raise the point, we are unable to see how this provision can apply to those debentures involved herein which were purchased prior to January 23, 1954, since they were all issued after January 22, 1951.

It is this latter right, together with the favorable coupon rate, relative stability of the issuers, and similar economic and investment factors which gave rise to the premium for which Congress has provided an amortization deduction. In *Hanover Bank* v. *Commissioner, supra* at 678, the Supreme Court explained this deduction:

By providing that amortization could be taken with reference to the "amount payable on maturity or on *earlier call date*" (italics added), Congress recognized that bonds are generally subject to redemption by the issuer prior to their maturity. * * *

We perceive no similarity or connection between the right of an *issuer* to demand presentation of the debentures for payment at prearranged prices (i.e., a "call") and the right of a *holder* to exercise an option to transform his investment into stock. It is obvious that a "call" by the issuer will often be made because the coupon rate has become too high in relation to the availability of money on the open market. In other words, the bond being called has become onerous to the issuer, and for this same reason, more attractive to the holder. This is the very time when the holder is least likely to convert.

We are unable to conclude that conversions are tantamount to calls, since neither the rights nor the obligations attendant to that part of a premium [8] which may be amortized have been called into play by the act of converting. The actor is different, the right exercised is different, and the economic effect is different. We do not believe that Congress intended section 171 (b) (2) to apply to anything other than the payment by an issuer, at its option, of its principal obligation by calling in its debentures for payment prior to maturity. We cannot imagine that Congress intended to permit this deduction upon the happening of an event wholly unrelated to the call provisions of the debenture. Conversion is such an event. As the Supreme Court stated in *Hanover Bank* v. *Commissioner, supra* at 687:

A firmly established principle of statutory interpretation is that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." *Crane* v. *Commissioner*, 331 U.S. 1, 6. The statute in issue here, in plain and ordinary language, evidences a clear congressional intent * * *

The statute clearly refers to a "call" at the option of the issuer. Petitioners claim that their conversion rights are equivalent to a "call" at *their* option, and should therefore be treated as a call. It is hard to imagine a more inaccurate description of the conversion privilege. Their "call" rights, if any, are to obtain stock for a specified consideration, i.e., the bonds. With respect to the bonds, however, they had no right to "call." Indeed, their debentures were specifically *subject to being called by the issuers*. It is clear that

[8] Congress recognized the difference between conversions and calls by requiring allocations of parts of premium to each. See footnote 4 and H. Rept. No. 2319, 81st Cong., 2d Sess., p. 47 (1950).

petitioners did not effect a "call" or "redemption" of the debentures by their conversions, since it is the rights relative to the premium not allocable to the conversion feature which are relevant.

Indeed, were we to categorize the conversion by its economic effect, we would liken it to an exchange of one asset (a debenture) for another (stock). It appears that the stock would be at least as valuable as the debenture, otherwise conversion would probably not occur. Since petitioners are receiving at least equivalent value when they convert, it seems improper to torture the term "call" to allow petitioners a substantial deduction for a transaction in which they sustained no loss. As a contrast, a call by the issuer would frequently result in the receipt of less than the bondholder's adjusted basis, and the deduction of this difference in the year of call was *all* that Congress intended to permit under section 171(b)(2).

We may differentiate even further the effect of a call from that of a conversion by applying the reasoning underlying section 171 to a conversion and in so doing consider the treatment of related situations with comparable problems.

First, we are aware of no instance in which a holder of a convertible bond issued at a discount has offered to include his unamortized bond discount in income for the taxable year in which he converted. If petitioners here are correct, such inclusion would be proper for the bond would have been "redeemed." Similarly, the tax treatment to the issuing corporation upon conversion of its bonds issued at a premium has never to our knowledge been adjudicated, however it would seem that such a transaction results in no recognizable gain or loss to the corporation.[9] The unamortized premium seems logically to be a part of the subscription price of the stock. See *Commissioner* v. *Capento Securities Corp.*, 140 F. 2d 382 (C.A 1, 1944), affirming 47 B.T.A. 691, where a stock-for-bonds exchange was viewed as a recapitalization.

The situation which has been litigated is the tax treatment to the issuing corporation of unamortized bond discount upon conversion. In treating the date of conversion as a termination point for deductions by the issuer in *Pierce Oil Corporation*, 32 B.T.A. 403, 421–422 (1935), the Board of Tax Appeals said:

Whatever may be said for the deduction of the unamortized discount when the bonds are discharged, even though it be with the proceeds of an issue of new bonds, see *San Joaquin Light & Power Corporation* v. *McLaughlin, supra; Helvering* v. *California Oregon Power Co., supra; Helvering* v. *Union Public Service Co., supra; Great Western Power Co. of California*, 30 B.T.A. 503, it can not apply to the direct exchange of shares for the outstanding bonds. The

---

[9] SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY.

(a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

reason for recognizing discount is the anticipation of payment at maturity of the full amount of the obligation, which amount is greater than the amount originally received. *Old Mission Portland Cement Co.* v. *Helvering*, 293 U.S. 289. During the period of the obligation the supposition is indulged that it will be paid in full, and this supposition is what supports the amortization of the discount. *Helvering* v. *Union Pacific R.R. Co.*, *supra.* If the original amount were received for shares instead of bonds, there would be no fixed maturity, no discount, and no amortization, *Carter Hotel Co.*, 25 B.T.A. 933; affd., 67 Fed. (2d) 642. So, when the obligation of the bond becomes by substitution not a new obligation but a share in the enterprise, the occasion for amortization ceases, and the deductions which have theretofore been justified by an anticipation of full payment must cease with the fall of their supporting hypothesis, *Old Mission Portland Cement Co.* v. *Helvering*, *supra.* Although the accounting will no doubt change, this does not give reality to a loss.

See also *375 Park Avenue Corporation*, 23 B.T.A. 969 (1931); *Liquid Carbonic Corporation*, 34 B.T.A. 1191 (1936); G.C.M. 9674, X–2 C.B. 354 (1931).

The reasoning in these cases is the same as that underlying section 171, namely, that as long as interest payments are to be made, adjustments for premium or discount must also be made where the coupon rate does not constitute the true yield of the bonds. *Chicago & North Western Ry. Co.*, 22 B.T.A. 1407, 1434–1435 (1931), reversed on other grounds 66 F. 2d 61 (C.A. 7, 1933), certiorari denied 290 U.S. 672; *C., R. I. & P. Railway Co.*, 13 B.T.A. 988, 1027–1036 (1928), modified on other grounds 47 F. 2d 990 (C.A. 7, 1931), certiorari denied 284 U.S. 618. However, when the obligation to pay interest is substituted for, no further inclusions or deductions are proper. See *Pierce Oil Corporation*, *supra.*

Section 171 (b) (2) exemplifies this reasoning. A call price represents the payment of not only face value at maturity but also an additional payment to the bondholder in lieu of his right to receive interest at the coupon rate between call and maturity. Since upon call the holder in effect receives his future interest payments, it follows that he should be entitled to deduct the unamortized bond premium representing exactly that portion of such future interest constituting a return of the cost of obtaining the favorable coupon rate.

This, indeed, is what section 171 (b) (2) provides. Consonant with this treatment, upon retirement the issuer must include the unamortized bond premium in income during the year of retirement. *Helvering* v. *California Oregon Power Co.*, 75 F. 2d 644 (C.A.D.C. 1935); sec. 1.61–12 (c), Income Tax Regs.

Thus, the statutory plan is that bond premium and discount are amortized to correlate the inclusion or deduction of interest to the actual yield on the bonds. Since a call price takes account of the future interest payments which would otherwise have to be made, the inclusion or deduction of the unamortized bond premium or discount

is necessary upon redemption to accurately reflect the actual amount of interest received or paid.

We regard the act of conversion as the point from which the remaining unamortized bond premium (or discount) is treated as a cost of the stock into which the bond has been converted [10] rather than of the bond itself.[11] The basis of the stock would be the basis, to the holder, of his bond immediately before the conversion (which was at his option) and would include the unamortized bond premium.

Congress intended to cure the inequities of the pre-1942 capital loss treatment of premiums by allowing such premiums to be recovered by means of the deductions for amortization to the maturity, or designated call, of the bonds, spread evenly through their expected life. However, upon conversion this prospective return of premium (and deductions therefor) ceases to exist, and future gain or loss depends solely on the value of the stock. It therefore follows that the basis of the bonds at the time of conversion is the cost of the stock, and no justification remains for allowing the deduction of the then unamortized bond premium. Petitioners' capital investment, valued at their bases on the date of conversion, has been transferred from the bonds to the stock and therefore no prospective loss of that capital with respect to the bonds can exist thereafter. Any future gain or loss will be recognized upon disposition of the stock. We therefore conclude that respondent properly disallowed the disputed deductions.[12]

*Decisions will be entered for the respondent.*

---

[10] See sec. 1016(a)(5).

[11] See Fleischer and Cary, "The Taxation of Convertible Bonds and Stocks," 74 Harv. L. Rev. 473 (1961).

[12] We do not pass on the question (not argued by respondent) of whether the purchases of the bonds involved herein were mere formalities and should be disregarded for tax purposes. See sec. 1.171-2(a)(3), Income Tax Regs. We do note that, under petitioners' theory, it would have been possible for a taxpayer to purchase convertible bonds at a premium intending to convert immediately so that he would get an immediate ordinary deduction, but receive capital gains treatment upon the eventual disposition of the stock. Compare *Knetsch* v. *United States,* 364 U.S. 361 (1960).